David A. MAPES, Petitioner–
Appellee/Cross–
Appellant,

v.

Ralph COYLE, Warden, Respondent–
Appellant/Cross–Appellee.

Nos. 96–4189, 96–4196.

United States Court of Appeals,
Sixth Circuit.

Argued Jan. 27, 1998.

Decided March 24, 1999.

Rehearing and Rehearing En Banc
Denied April 30, 1999.

Harry R. Reinhart (argued and briefed), Reinhart Law Office, Carol Wright (briefed), Columbus, Ohio for Petitioner-Appellee/Cross-Appellant.

Stuart A. Cole, Asst. Attorney Gen. (argued and briefed), Matthew J. Lampke, Office of the Attorney General of Ohio, Capital Crimes Section, Columbus, Ohio, for Respondent-Appellant/Cross-Appellee.

Before: RYAN, SILER, and DAUGHTREY, Circuit Judges.

RYAN, J., delivered the opinion of the court, in which DAUGHTREY, J., joined. SILER, J. (pp. 429–31), delivered a separate opinion concurring in part and dissenting in part.

## OPINION

RYAN, Circuit Judge.

Warden Ralph Coyle appeals from the recommendation by a federal magistrate judge, adopted by the district court, that a conditional writ of *habeas corpus* should issue barring Ohio from carrying out the death sentence imposed on petitioner David A. Mapes by an Ohio state court. Mapes cross-appeals the denial of his *habeas* petition concerning his judgment of conviction. We find that, with one possible but important exception, Ohio courts did not deprive Mapes of any constitutionally guaranteed right. The exception is the significant likelihood that Mapes's appellate counsel was unconstitutionally ineffective. Thus, while we must affirm the district court's rejection of Mapes's challenge to his conviction, we will remand so that the district court can determine, in an evidentiary hearing, whether the performance of Mapes's appellate counsel fell below the constitutional minimum.

## I. PROCEDURAL HISTORY

### A.

On the morning of January 30, 1983, two or three armed men entered Chap's Bar in Cleveland, Ohio, and attempted to rob its employees. In the course of the robbery, one of the owners of the bar, John Allen, was shot and killed. Later, upon hearing news accounts of this crime, a Cleveland man contacted the police and indicated that David Mapes had earlier attempted to recruit him to help commit the robbery at Chap's. The police then showed Mapes's photo, in a photo array, to one of the survivors of the robbery. That person, John Hovekamp, selected three photos that resembled the gunman; one was of Mapes. Mapes was arrested and placed in a lineup. Hovekamp positively identified him as the Chap's gunman.

Mapes admitted that he had participated in the robbery, but claimed that he was not the gunman. However, Mapes's accom-

plice testified at trial that Mapes was the shooter, as did another survivor, Ronald Rucci. Mapes's wife and a neighbor testified at trial that Mapes owned a sawed-off shotgun like the one used at Chap's, and police found shells, of the same type used to kill Allen, in a drainpipe hole at Mapes's apartment. Not surprisingly, an Ohio jury convicted the petitioner of aggravated murder.

Mapes had been charged with a death-penalty "specification" alleging that he had previously been convicted of an offense, an essential element of which was the purposeful killing of another. This specification was tried to the judge alone. Because Mapes had pleaded *non vult*, or "no contest," in 1972 to a charge of murder in New Jersey, the Ohio trial court found Mapes guilty of the specification. One of Mapes's *habeas corpus* assignments of error is that the trial court wrongly excluded evidence that Mapes was not the "triggerman" in the New Jersey killing. Mapes did not, however, contest the fact that he had previously been convicted of murder.

The trial court's finding regarding the prior conviction made Mapes preliminarily "eligible" for the death penalty and required that the jury hear evidence regarding seven statutory aggravating and mitigating factors and, based on its determination whether the aggravating factors outweighed the mitigating factors or *vice versa*, recommend to the court that Mapes should or should not be sentenced to death. The only evidence of mitigation Mapes submitted was his unsworn statement that he was only 18 years old at the time of the New Jersey murder, that the conviction was really for manslaughter in light of the sentence he received, and that he was not responsible for the actual shooting. In rebuttal, the prosecutor emphasized the fact that Mapes's statement was unsworn—thereby preventing cross-examination—and argued that the statement was irrelevant in any case. The court then instructed the jury that it must reach unanimity on whether to recom-mend the death penalty before it could consider a recommendation of a term of imprisonment. Ultimately, Mapes was sentenced to death.

### B.

A new attorney was appointed to represent Mapes on his direct appeal to the Ohio Court of Appeals, and counsel brought 12 assignments of error. Of the 12, 11 pertained to the guilt phase of trial. In the only sentencing argument, Mapes alleged that, by commenting on the fact that his mitigation statement was unsworn, the prosecutor had infringed on Mapes's Fifth Amendment right to remain silent. Appellate counsel did *not* raise several sentencing issues about which trial counsel had made contemporaneous objections. Mapes's judgment of conviction and his death sentence were affirmed by the Ohio Court of Appeals, *State v. Mapes*, No. 47191, 1984 WL 5285 (Ohio Ct.App. Oct. 25, 1984), and they were affirmed again upon appeal to the Ohio Supreme Court, *State v. Mapes*, 19 Ohio St.3d 108, 484 N.E.2d 140 (Ohio 1985).

### C.

Mapes then obtained a third attorney, and petitioned the trial court for post-conviction relief. That counsel argued that Mapes's trial and appellate lawyers had both rendered ineffective assistance, and that the trial court had committed seven reversible errors. The trial court declined to grant relief, ruling that it had no authority to overrule the court of appeals' affirmance of Mapes's conviction and sentence. The court of appeals affirmed the trial court's decision, holding that the trial judge had correctly refused to pass on Mapes's assignments of error. *State v. Mapes*, No. 56608, 1990 WL 20864 (Ohio Ct.App. Mar. 8, 1990). Finally, the Ohio Supreme Court dismissed Mapes's appeal from the denial of post-conviction relief, ruling that "no substantial constitutional question" existed. *State v. Mapes*, 53 Ohio St.3d 703, 558 N.E.2d 57 (1990).

## D.

On January 10, 1991, Mapes filed his *habeas corpus* petition in the federal court. He brought 15 assignments of constitutional error. The petition was referred to a magistrate judge who declined to address the constitutional merits of many of these, for the reason that seven of the assignments of error presented in Mapes's *habeas* petition were not presented on his direct appeal, and thus were deemed precluded by Ohio courts on post-conviction appeal. That is, an adequate and independent state-law ground existed for denying relief even if Mapes's trial was constitutionally flawed.

Of the remaining eight assignments of error, the magistrate judge recommended that all but one be dismissed. The only claim credited by the magistrate judge was that Mapes had received ineffective assistance of appellate counsel by virtue of counsel's failure to argue on direct appeal that the trial court had impermissibly precluded the jury from considering mitigating factors relating to the prior guilty plea Mapes had entered in New Jersey. Thus, the magistrate judge recommended a grant of Mapes's petition unless Ohio courts granted another review within 90 days. The district court agreed, and this timely appeal followed.

## II. STANDARD OF REVIEW

■ The Antiterrorism and Effective Death Penalty Act of 1996, or AEDPA, was signed into law on April 24, 1996. Pub.L. No. 104–132, 110 Stat. 1214 (codified at 28 U.S.C. § 2254 (1996)). However, it does not apply to *habeas* petitions pending on that date. *See Lindh v. Murphy,* 521 U.S. 320, 321–23, 117 S.Ct. 2059, 2061, 138 L.Ed.2d 481 (1997); *Rickman v. Bell,* 131 F.3d 1150, 1154 (6th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1827, 140 L.Ed.2d 962 (1998). Because Mapes's *habeas* petition was filed in 1991, the pre-AEDPA standard of review applies, which we recently summarized in *Rickman.* That is, primary, or historical, facts found

by state courts are presumed correct and are rebuttable only by clear and convincing evidence. Determinations of law, or determinations involving mixed questions of fact and law, however, receive *de novo* review. *Rickman,* 131 F.3d at 1153.

## III. ANALYSIS

### A. Substantive Trial Error

■ Mapes argues in his *habeas* appeal that the trial court committed a number of reversible errors. He contends that the trial court misinstructed the jury on several matters; that the jury was allowed to return inconsistent verdicts at the guilt phase; that the jury was allowed to return a non-unanimous verdict at the sentencing phase; that the trial court was biased against Mapes and committed judicial misconduct; and that the court wrongly excluded relevant evidence at the bench trial on the prior-murder-conviction specification. Of course, we are concerned only with errors of constitutional dimension; moreover, even constitutional errors will not be noticed if an adequate and independent state-law ground exists for upholding the conviction or sentence. *See Wainwright v. Sykes,* 433 U.S. 72, 86–87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). Upon a careful review of the record and the parties' briefs, we conclude that Mapes is foreclosed from bringing most, but not all, of the alleged assignments of error because he failed to raise them in Ohio courts—and this failure is an adequate and independent ground for affirmance.

Since the central issue before us is whether, as the federal district court found, Mapes's appellate counsel was constitutionally ineffective for failing to raise several alleged trial errors, we must first determine whether the trial court in fact erred. If it did not, there can be no constitutional deficiency in appellate counsel's failure to raise meritless issues. If the trial court did err, the questions then become whether appellate counsel was constitutionally ineffective for failing to

raise those errors on appeal and, if so, whether the petitioner was prejudiced by counsel's unsatisfactory representation. We shall address those questions in due course, but we must, of course, first examine Mapes's allegations of error, even though, on their own merits, they may be defaulted.

### 1. Jury Instructions

Mapes contends that the trial court instructed the jury erroneously in the following ways:

- The trial judge repeatedly told the jury that its job was merely to recommend a sentence. The intent and actual effect of this misleading instruction was to diminish the jurors' sense of responsibility and increase the likelihood of a death verdict. This was error because a "recommendation" *not* to impose the death penalty would be binding on the court, and because Ohio trial courts almost never reject a death recommendation.

- The trial judge specifically instructed the jury that a gun specification was a death specification. It is not. Under Ohio law, it is irrelevant whether the erroneous instruction misled the jury, because precedent requires reversal if such error occurs.

- The jury was instructed that it had no discretion in making its sentencing recommendation if aggravation was found to outweigh mitigation. Even if the jury found the aggravating circumstance of the prior killing to outweigh any mitigating factors, it should have been able to exercise merciful discretion and recommend against the death penalty.

- The jury was given "acquittal-first" penalty-phase instructions. That is, the jury was instructed that it had to reach unanimity on whether Mapes should be sentenced to death before it could consider any lesser sentence. Such instructions impermissibly interfere with jury deliberations by requiring that an affirmative step be taken before deliberation may move from one level to the next, and give a negotiating edge to jurors in favor of recommending the death penalty.

- The court erred by giving a supplemental instruction which prohibited the jury from considering mitigating factors related to the New Jersey conviction.

We discuss each of these contentions in turn.

#### a.

■ Pertinent to the first claim—the "recommendation" issue—the Supreme Court has recognized that there is a danger in leading a death-sentence jury to believe that the ultimate responsibility for a death sentence lies with appellate courts. *See Caldwell v. Mississippi,* 472 U.S. 320, 332–33, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In *Caldwell,* the prosecutor told a death-jury that a death sentence would really be determined by the state supreme court. *Id.* at 323, 105 S.Ct. 2633. This violated the defendant's rights under the Eighth Amendment to be protected from cruel and unusual punishment primarily because it allowed the jury to believe that it could make an incorrect determination without harming the defendant, and because appellate courts are ill-equipped to accurately review such aggravation-mitigation determinations. *Id.* at 330–32, 105 S.Ct. 2633.

■ However, in order to make out a *Caldwell* violation, a defendant must show that the prosecutor or trial judge improperly described the jury's role under state law in order to "water down" its responsibility. *Kordenbrock v. Scroggy,* 919 F.2d 1091, 1101 (6th Cir.1990). In *Kordenbrock,* the prosecutor told the jury that a death-sentence verdict would merely be a recommendation to the trial judge. State law provided that

"the judge shall give the jury appropriate instructions, and the jury shall retire to determine whether any mitigating or aggravating circumstances ... exist *and to recommend a sentence* for the defen-

dant. Upon the findings of the jury, *the judge shall fix a sentence* within the limits prescribed by law."

*Id.* (quoting Ky.Rev.Stat. Ann. § 532.025(1)(b)). This court found no constitutional violation because the prosecutor's characterization was "technically ... correct[ ]." *Id.*

In this case, Ohio law provides:

> Upon consideration of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted pursuant to division (D)(1) of this section, the trial jury ... shall determine whether the aggravating circumstances the offender was found guilty of committing are sufficient to outweigh the mitigating factors present in the case. If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall *recommend to the court* that the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend that the offender be sentenced to [one of various terms of imprisonment]....
>
> If the trial jury *recommends* that the offender be sentenced to life imprisonment with parole eligibility after serving twenty years of imprisonment or to life imprisonment with parole eligibility after serving thirty full years of imprisonment, the court shall impose the sentence recommended by the jury upon the offender. If the trial jury *recommends* that the sentence of death be imposed upon the offender, the court shall [weigh independently the aggravating and mitigating factors, and impose the death penalty if the former outweigh the latter, and impose a life sentence otherwise.]

Ohio Rev.Code Ann. § 2929.03(D)(2), Vol. I (emphasis added); *see id.* at (D)(3).

Thus, while it is somewhat inaccurate to state that a sentencing jury "recommends" a life sentence when such a recommendation would be binding, we conclude that even if the trial judge's instruction was erroneous it could not have diminished the jury's sense of responsibility in *Caldwell* terms. The only plausible way that Mapes's jury could have been lulled into a diminished sense of responsibility is if it erroneously believed that a death verdict would only be a recommendation. However, this is an accurate statement of Ohio law. Further, one of the primary dangers identified in *Caldwell*—that the entity to which the jury ceded responsibility could not adequately exercise that responsibility—is absent here. In *Caldwell*, the state courts of appeals could not accurately assess the aggravating and mitigating factors presented in a sentencing hearing. In this case, it was the trial judge presiding over the hearing who reviewed the jury's determination. There was no constitutional error.

### b.

As for the second issue, Mapes does not point to any instance in which the penalty-phase jury was instructed that a gun specification it found proved at the guilt phase had any bearing on the death-penalty recommendation. Moreover, the trial court *did* instruct the sentencing jury that the gun specification was irrelevant, and repeatedly stated that the only aggravating factor to be considered was the prior New Jersey killing. There was no error.

### c.

■ Third, an instruction to a death-sentence jury that it may disregard the statutory criteria for imposing a death sentence may be constitutionally *im*permissible in light of the probability that such an instruction would result in arbitrary and unpredictable results. *See California v. Brown*, 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). According to the Court, "sentencers may not be given un-

bridled discretion in determining the fates of those charged with capital offenses." *Id.* Thus, an instruction that the jury should not be swayed by "mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling" was not only unobjectionable in *Brown,* it "serve[d] the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on [irrelevant,] extraneous emotional factors." *Id.* at 542, 543, 107 S.Ct. 837. Thus, there is no merit whatsoever to Mapes's claimed entitlement to a "merciful discretion" instruction, in light of the likely tendency of such an instruction to lead to arbitrary differences in whom is selected to be sentenced to death.

**d.**

■ As for the fourth issue, the trial court instructed the jury as follows:

Now, as I have indicated, if all twelve jurors find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, that is the aggravating circumstances which he was found guilty, Specification 4 in each count, then you must return a finding to the Court.

I instruct you, as a matter of law, that if you make such finding then you have no choice and must recommend to the Court that the sentence of death be imposed on the defendant, David Mapes.

. . . . .

On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, the other evidence, the unsworn statement of David Mapes, the evidence of the State of Ohio, and the arguments of counsel, you find that the State of Ohio failed to prove that the aggravating circumstances which the defendant, David Mapes, was found guilty of committing outweigh the mitigating factors, then you will return your verdict reflecting your decision. That is, you must unanimously find that the State has failed to prove beyond a reasonable

doubt that the aggravating circumstances of which the defendant was found guilty of committing outweigh the mitigating factors. In this event you will *then proceed* to determine which of two possible imprisonment sentences to recommend to the Court.

(Emphasis added.) But the Ohio death-sentence statute contains no requirement that a capital jury must unanimously *reject* a death sentence before considering life imprisonment. *See* Ohio Rev.Code Ann. § 2929.03(D)(2). A recommendation of death must be unanimous, but "[a]bsent such a [unanimous] finding, the jury shall recommend that the offender be sentenced to [some variety of life sentence.]" *Id.* Thus, under the statute, a jury that was not unanimous either way on a death sentence could consider a life sentence.

Moreover, the Ohio Supreme Court has ruled that an acquittal-first instruction, such as the one given by the trial court here, violates the Eighth and Fourteenth Amendments by creating a risk of an erroneous imposition of the death penalty. *See State v. Brooks,* 75 Ohio St.3d 148, 661 N.E.2d 1030, 1041 (1996).

The record reflects that the jury in this case was instructed in a manner completely contrary to law, making it less likely for Brooks to benefit from the opinion of one juror that the death penalty was inappropriate.... [I]f a juror believed his one vote could not affect the ultimate result, he might acquiesce in the death sentence. In this case, the jury instruction undermined the reliability of the jury verdict and risked erroneous imposition of the death sentence, thereby materially prejudicing Brooks's right to a fair trial.

*Id.* at 1042. This error required vacating the death sentence and remanding for re-sentencing. *Id.* Although the trial court in this case did not have the benefit of *Brooks,* that case clearly establishes that the trial court misapplied Ohio Revised Code § 2929.03(D)(2) by requiring the jury

to unanimously reject the death penalty before considering a life sentence.

### e.

■ The fifth alleged error occurred in response to a question from the deliberating sentencing jury. In answer to the jurors' question whether they were permitted to consider mitigating evidence with respect to Mapes's prior New Jersey murder conviction, the trial court stated, *inter alia:* "The mitigating factors do not apply to the prior murder conviction at all."

The United States Supreme Court has strongly suggested that *all* relevant mitigating factors must be considered by a death-sentence jury. For instance, in *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), the trial court considered the youth of the offender in imposing the death sentence, but refused to consider the fact that the defendant had been physically abused and that he was emotionally disturbed. *Id.* at 108–09, 102 S.Ct. 869. The Court held that the trial court violated the defendant's Eighth Amendment rights by refusing, as a matter of law, to evaluate all the evidence of mitigation. *Id.* at 113, 102 S.Ct. 869.

We find that the limitations placed by [the trial and appellate] courts upon the mitigating evidence they would consider violated the rule in *Lockett.* Just as the State may not by statute preclude the sentencer from considering *any* mitigating factor, neither may the sentencer refuse to consider, *as a matter of law, any* relevant mitigating evidence. In this instance, it was as if the trial judge had instructed a jury to disregard the mitigating evidence Eddings proffered on his behalf. The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration.

*Id.* at 113–15, 102 S.Ct. 869 (some emphasis added) (footnote omitted).

Several times, the *Eddings* Court reiterated the relevant rule:

"[W]e conclude that the Eighth and Fourteenth Amendments require that the sentencer ... not be precluded from considering, *as a mitigating factor, any* aspect of a defendant's character or record and *any* of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death."

*Id.* at 110, 102 S.Ct. 869 (some emphasis added) (quoting *Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)). The *Eddings* Court also noted that the statute in *Gregg v. Georgia,* 428 U.S. 153, 197, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), was upheld because it directed the jury to consider "any mitigating circumstances." *Id.* at 111, 102 S.Ct. 869. Stated differently, "the fundamental respect for humanity underlying the Eighth Amendment ... requires consideration of the character *and record* of the individual offender...." *Id.* at 112, 102 S.Ct. 869 (emphasis added) (internal quotation marks and citation omitted). Thus, the *Eddings* Court consistently indicated that *any and all* mitigating circumstances must be considered in reaching a death sentence. *Id.* at 111–15, 102 S.Ct. 869.

If, after *Eddings* and *Lockett,* there remained any question about the relevance of mitigating evidence pertaining to a prior crime it was resolved in *Sumner v. Shuman,* 483 U.S. 66, 81, 107 S.Ct. 2716, 97 L.Ed.2d 56 (1987). Nevada's death-penalty statute required the imposition of a death sentence whenever an inmate serving a life sentence killed someone in prison. The inmate in *Sumner* was not allowed to introduce any mitigating factors, and a death sentence was imposed. The Court found this unconstitutional because the sentencing authority must be permitted to consider any relevant mitigating evidence before imposing a death sentence. *Id.* at 76, 107 S.Ct. 2716. Most importantly, the Court explicitly stated that the circumstances regarding the crime for

which the inmate was serving a life sentence were relevant. *Id.* at 80–81, 107 S.Ct. 2716.

> Even if the [life-sentence] offense was first-degree murder, whether the defendant was the primary force in that incident, or a nontriggerman like Shuman, may be relevant to both his criminal record and his character.

*Id.* at 81, 107 S.Ct. 2716.

In Mapes's case, after retiring to determine whether to recommend a death sentence, the jury submitted two questions to the judge. In open court, the judge responded:

> Now, as to the first question, which reads as follows:
>
> > "Are we [ (the jury) ] just to consider evidence presented to us in the sentencing hearing or testimony and evidence from both the trial and sentencing hearing as regarding the mitigating factors?"
>
> Of course, this is the fourth time I have explained this orally to you. If you find from all the evidence at the sentencing hearing and at the trial that the defendant has gone forward with some evidence of mitigation, and you find that the evidence exists as to the mitigation, then you are to consider it.

> The next question read:
>
> > "Does [sic] the seven mitigating factors as it applies [sic] to [the prior-conviction death-penalty specification] cover this case and the prior conviction?"
>
> I have at least three times explained this to you. You are required to accept without reservation the fact that the defendant was convicted in 1972 of murder. And an essential element of which was the purposeful killing of another. *The mitigating factors do not apply to the prior murder conviction at all.* I might say that this is the aggravating circumstances that he was found guilty of when he waived the jury to me. And

you are here to compare any mitigating circumstances that you find in this case with that aggravating circumstance.

(Emphasis added.) Defense counsel objected to this instruction.

After further deliberations, the jury again proffered two questions. The court responded, in relevant part:

> This means that the defendant, at this particular hearing has to produce evidence, some evidence of mitigating factors. If the defendant doesn't produce any evidence and the only evidence you have from the defendant is the statement of the defendant, and if you find mitigating factors, fine, and if you don't, you don't have any mitigating factors.

In its third mid-deliberations communication to the court, the jury requested a copy of Mapes's unsworn statement, which was read a second time. The statement offered no mitigating factors except those that applied to the New Jersey murder. The jury then returned a recommendation of death.

We find that the Ohio trial court erred by effectively prohibiting the jury from considering any mitigating evidence concerning the prior murder conviction. Although the mitigating evidence relating to the New Jersey conviction was not as weighty as would have been evidence regarding Mapes's culpability for the Allen murder, Mapes's exculpatory evidence relating to his role in the New Jersey murder was nonetheless relevant to his overall moral culpability. Ohio's death-penalty statute clearly requires proof that the defendant committed at least one abhorrent act *in addition* to his conviction for aggravated murder. Although the U.S. Supreme Court has stated that *all* relevant mitigating factors must be considered, Mapes's jury was not allowed to consider the New Jersey mitigation evidence. The excerpt from the trial transcript we have quoted above demonstrates that the jury believed it could not consider the mitigating factors submitted by Mapes relevant to

the New Jersey conviction, and finding no other mitigating factors in Mapes's statement, believed it was *required* to recommend death, as defense counsel predicted when objecting to the court's charge.

■ But all that being so, the trial court's instructional errors do not require granting Mapes's *habeas* petition because neither of these last two instructional issues was raised on appeal. Thus, Mapes's procedural default is an adequate and independent ground for affirming his sentence. Only in the context of deciding whether Mapes's appellate counsel was unconstitutionally ineffective in failing, nevertheless, to raise these matters on direct appeal are these underlying errors relevant.

### 2. Guilty Verdict

■ The petitioner contends throughout his briefs on appeal that the jury's verdict of aggravated murder is logically inconsistent with its not-guilty verdicts on two death "specifications." That is, the jury convicted Mapes of aggravated murder, one element of which is the specific intent to kill, but acquitted him of two death-penalty specifications, one alleging that the murder took place during an aggravated robbery, and the other that the death occurred during an aggravated burglary. Under Ohio law "aggravated" burglary is defined as:

> (A) No person, by force, stealth, or deception, shall trespass in an occupied structure, ... with purpose to commit therein any theft offense, ... or any felony, when any of the following apply:

> . . . . .

> (2) The offender has a deadly weapon ... on or about his person or under his control[.]

Ohio Rev.Code Ann. § 2911.11. Aggravated robbery is a robbery, that is, committing a theft offense, if the person has "a deadly weapon ... on or about his person or under his control."

Mapes further maintains that being acquitted on a principal-offender specification means that the jury found he was not the "triggerman" in the Chap's shooting, and that being acquitted of the other specification means he did not have the specific intent to kill. Mapes further maintains that the verdicts are findings of constitutional fact, and thus the state courts' recitation of the facts, implying or stating that Mapes *was* the triggerman and *did* have the specific intent to kill Allen, is erroneous.

In other words, if Mapes neither shot Allen nor was complicit in a plan to shoot him, then he lacked, as a matter of constitutional law, the requisite culpability necessary under the Eighth Amendment to justify the death penalty. Additionally, Mapes would have lacked the requisite intent under the Ohio aggravated-murder statute which unambiguously requires, in a felony-murder situation, that a defendant who participated in the felony also have intended to cause the death of another. Therefore, his argument continues, if the state-court judgment is allowed to stand, he will have been convicted of aggravated murder although the jury found one of the essential elements lacking. According to Mapes, this violates his right to due process: his procedural right to know in advance the elements of a crime he is charged with, and his substantive right to fundamental fairness.

*United States v. Powell,* 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984), requires us to reject Mapes's contentions. In *Powell,* the defendant's phone had been legally tapped, and she was recorded helping her son and husband distribute narcotics and collect money for drugs sold. When she was arrested, she had two kilograms of cocaine and 2700 methaqualone tablets, among other things, in her car. *See id.* at 59, 105 S.Ct. 471. A jury convicted her of using the telephone in conspiring to possess with intent to distribute cocaine. However, the same jury acquitted her of conspiring to possess with intent to distribute cocaine. *See id.* at 59–60, 105 S.Ct.

471. The defendant appealed from the convictions, claiming that the acquitted count constituted an element of the telephone-facilitation count of which she was convicted, and that therefore the verdicts were inconsistent. The Ninth Circuit agreed, finding that the acquittal on the predicate felony demonstrated that insufficient evidence existed as to the telephone-facilitation charge. *Id.* at 61, 105 S.Ct. 471.

The Supreme Court rejected this analysis, reasoning that " '[t]he most that can be said [about an inconsistent verdict] is that the verdict shows that either in the acquittal or the conviction the jury did not speak their [sic] real conclusions, but that does not show that they were not convinced of the defendant's guilt.' " *Id.* at 64–65, 105 S.Ct. 471 (citation omitted). Significantly, the Court repudiated the argument that the portion of an inconsistent verdict favorable to the defendant must be accepted and the portion favorable to the government discarded. *See id.* at 65, 105 S.Ct. 471. To the contrary, it is possible "that the jury, convinced of guilt, properly reached its conclusion on the compound offense, and then through mistake, compromise, or lenity, arrived at an inconsistent conclusion on the lesser offense." *Id.* Although " 'error,' in the sense that the jury has not followed the court's instructions, most certainly has occurred," nothing in the Constitution requires that this "error" subject the jury's collective judgment to review and reversal. *Id.* at 65–66, 105 S.Ct. 471.

> [O]nce the jury has heard the evidence and the case has been submitted, the litigants must accept the jury's collective judgment. Courts have always resisted inquiring into a jury's thought processes . . .; through this deference the jury brings to the criminal process, in addition to the collective judgment of the community, an element of needed finality.

*Id.* at 67, 105 S.Ct. 471 (citations omitted).

Even if Mapes's convictions on the aggravated-murder charges and the ac-quittals on the specifications are truly inconsistent—a conclusion that does not necessarily follow—this does not mean that Mapes lacked the specific intent to kill Allen. All the verdicts demonstrate is that the jury found Mapes guilty of aggravated murder, including the element that he possessed the intent to kill, and that it found him not guilty of two specifications which would have supported the death penalty under Ohio law. The aggravated-murder conviction does not require guilty verdicts on the specifications, and therefore cannot be set aside. Similarly, the state could not have sought the death penalty under Ohio law based only on the finding implicit in the aggravated-murder conviction that Mapes intended to kill Allen. *Powell* teaches that the inconsistent verdicts are viewed completely separately, and that no conclusion may be drawn from comparing the two. Ohio is within constitutional limits in finding Mapes guilty of aggravated murder and in imposing the death penalty because the jury found he had the requisite intent on the substantive charge.

### 3. Judicial Bias and Misconduct

In the course of his state-court appeal from the denial of post-conviction relief, Mapes claimed for the first time that the trial judge was biased, and that the facts to establish such bias existed outside the record and were not available upon direct appeal. Primarily, Mapes relied on affidavits provided by a juror, June Chatman, and her husband. When contacted by Mapes's present counsel in 1991—recall that the trial occurred in 1983—juror Chatman and her husband attested that the trial judge called Mr. Chatman on the telephone during the trial, saying that he didn't understand why Mrs. Chatman "wouldn't go along with the group and why was she holding out on convicting Mr. Mapes" given that "every-

body else was agreeing." Further, the affidavits allege that during the trial, the court attempted to intimidate Mrs. Chatman by refusing her requests to seek medical treatment. Mrs. Chatman maintains that she was pressured by the court into voting for both the conviction and the death sentence.

The original trial judge initially reviewed this post-conviction allegation, and denied Mapes an evidentiary hearing, ruling that the allegation was barred by *res judicata* because it could have been raised on direct appeal. On the next level of post-conviction appeal, the court of appeals also denied Mapes an evidentiary hearing, even though he had alleged that the trial judge had contacted a juror and that the evidence substantiating this claim was necessarily outside the trial record. The court of appeals stated, correctly we think, that Mapes "ha[d] not provided this court with any facts that would suggest bias." In fact, in our own review of the 28 exhibits covering 280 pages to which Mapes points as evidence of the trial court's improper conduct, we find nothing—other than the Chatman affidavits—to indicate that the trial judge did anything improper or was in any way biased.

As for the Chatman issue, Mapes contends that there was no *proper* means by which the trial judge could have obtained the information regarding Mrs. Chatman's hold-out status, and that perforce the judge's actions show his bias and misconduct. Assuming the Chatman affidavits are truthful, we agree with this assessment. Nevertheless, we find that Mapes's procedural default in failing to raise this issue on direct appeal is an adequate and independent ground for dismissing this assignment of error.

■ Review of a *habeas* petitioner's constitutional claims may be barred if the denial of those claims by the state court is supported by an adequate and independent state ground. *See Wainwright*, 433 U.S. at 86–87, 97 S.Ct. 2497. However, the fact that a petitioner has not complied with a

state procedural rule cannot bar federal review of constitutional claims if the state rule is not " 'firmly established and regularly followed.' " *Jones v. Toombs*, 125 F.3d 945, 946–47 (6th Cir.) (citation omitted), *cert. denied*, 521 U.S. 1108, 117 S.Ct. 2490, 138 L.Ed.2d 997 (1997).

The cases that Mapes claims demonstrate Ohio's wavering commitment to its procedural default rules do not in fact do so. Although he is correct that, in some cases, Ohio courts have forgiven some procedural defaults and considered the merits, in most of these cases the procedural default is the failure to contemporaneously object at trial. None of the cases cited by Mapes involves a post-conviction appeal in which an Ohio court overlooks the doctrine established by *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104, syllabus (1967). In *Perry*, the Ohio Supreme Court held that all assignments of error that were or could have been raised on direct appeal may not be considered collaterally in a post-conviction proceeding. *See id.* The only exception to that rule occurs when ineffective assistance of counsel is alleged and the petitioner had the same counsel during trial and on direct appeal. Even in its broadest form, this exception encompasses only those claims for which evidence is not contained in the trial record. *See State v. Cole*, 2 Ohio St.3d 112, 443 N.E.2d 169, 171 (1982).

■ Even if we assume that Ohio would extend this exception to allegations of trial court bias or misconduct, evidence of which is outside the record, Mapes forfeited his right to pursue this avenue by failing to adduce any such evidence in his initial post-conviction proceeding. He made the allegation at least as early as 1989 that Mrs. Chatman had been pressured, but provided no support for it until 1991. Thus, he had knowledge of the essential facts, but failed to obtain the necessary affidavits to prove them in Ohio proceedings. And he has failed to demonstrate that anything prevented him from

obtaining these affidavits before 1991—that is, in time to present them to Ohio courts on direct *or post-conviction* review. For the same reasons, Mapes is not entitled to an evidentiary hearing in federal court on this issue.

### 4. Unanimity of Sentencing Jury

Mapes also claims that the jury that sentenced him to death was not unanimous as required by Ohio law. He argues that when the trial judge polled the jurors, juror Chatman equivocated as to whether the guilty verdict was *her* verdict, and hinted at coercion. Before setting forth *verbatim* the trial court's exchange with juror Chatman, we shall examine Ohio case precedent on the subject.

When a juror indicates reservations about a verdict, or there is a potential lack of unanimity, Ohio law appears to require further inquiry on the part of the trial judge. In *State v. Brown*, 110 Ohio App. 57, 168 N.E.2d 419 (1953), for instance, a juror responded, when polled: "May I tell the truth? ... I went with the rest because I was the only one left." *Id.* at 420. Shortly thereafter, the following occurred:

> [Defense Counsel]: Your Honor, I move to permit her to tell what happened.
>
> The Court: No. No, not entitled to tell what happened. No. She hasn't any right to tell what happened.
>
> [Defense Counsel]: If it isn't her verdict, do you want her to so state?
>
> The Court: I want her to state.
>
> [The juror]: Yes, but I have told you—
>
> The Court: All right. It is. It either is or isn't.
>
> . . . . .
>
> [Defense Counsel]: Just a moment, Your Honor, I move that said juror number two be permitted to state to you just what she was going to state, that is, that she voted "yes" for guilt, but it is not her verdict.

> That is what she wants to tell. I think she should be permitted to let the record show that. This is a serious—
>
> The Court: I do not expect to ask the juror that. I do not think I have any right to.
>
> [Defense Counsel]: Will you let her tell?
>
> The Court: No.
>
> . . . . .
>
> The court will accept your verdict. The jury is discharged.

*Id.* at 420–21. After noting that, in Ohio, unanimity is required in a criminal trial, the Ohio Court of Appeals reversed the judgment of conviction because there was no unequivocal assent by the juror to the verdict. *Id.* at 422. Although the trial court was correct to prohibit the juror from trying to *explain* her verdict, the court had a duty to ensure that the verdict was truly unanimous. Because a juror may change his mind between the jury room and the court room, a trial court must either interrogate a juror who equivocates about his answer, or direct the jury to retire for further deliberation.

In a later case, the Ohio Court of Appeals held that a juror's ambiguous statements did not require reversal of the conviction. *See State v. Fields*, 176 N.E.2d 845, 849–50 (Ohio Ct.App.1960). Although the precise dialogue is not provided in the court's opinion, it appears that one juror cast some doubt about her verdict by saying that, while she agreed to have the foreman sign the verdict form, she was reluctant to give her consent. However, when the jury was polled a second time, she stated definitely that it was her verdict. She was given "full opportunity" to say whether it was or was not her verdict, and ultimately and unambiguously chose the former. Thus, no error occurred. *Id.*

In finding no error in the jury verdict in Mapes's case, the federal magistrate judge relied on *Emmert v. State*, 127 Ohio St.

235, 187 N.E. 862 (1933). In that case, after ten of the jurors had claimed the guilty verdict as theirs, the final two jurors equivocated.

> By the Court (to Juror Miller): Q. Mrs. Miller, is this verdict which has been returned in open court your verdict? A. Well, I didn't want to sign it that way. Q. What is that? A. I didn't want to sign it that way. Q. Is it your verdict? A. I signed it; Yes, sir. Q. It is? A. I signed it. Q. What is that? A. I signed the verdict. Q. And it is your verdict? A. Well, I suppose if I signed it it would be. Q. I want to know if that is your verdict now. You ought to know if it is or not; is that your verdict? A. Well, I don't know. * * * Q. Is it not your verdict? A. In my heart I don't feel entirely satisfied with it. Q. You say that it is not your verdict? A. Well, I suppose you could call it that. Q. What is that? A. I suppose you could call it that. By the Court: Q. How about you Mrs. Leiter? A. Mine was because the majority rules is all. Q. I don't want to know the majority rule, I want to know whether that is your verdict? A. *It is my signature and my verdict; yes.* (Thereupon counsel confer with court at bench.) By the Court: Q. Mrs. Miller, we are a little confused as to your attitude. I should like to ask you this question in a larger form, but I am compelled to ask you in the language of the statute. Is or is not this verdict your verdict? A. *Yes; it is.*

*Id.* at 863 (emphasis added). The state supreme court held that the trial court had not erred, noting that both jurors were given ample opportunity to disclaim the verdict, but instead had ultimately· affirmed the guilty finding. *Id.*

In Mapes's case, the trial court asked each juror, "Is this your verdict?" Every juror responded affirmatively, except for June Chatman. The transcript of the jury poll reveals the following:

> [THE COURT:] ... The question I am going to ask you is, is this your verdict, and if it is you say, yes.

> . . . . .

> THE COURT: June Chatman. June Chatman.

> MRS. CHATMAN: This is the verdict?

> THE COURT: The one that we just read.

> MRS. CHATMAN: Yes.

Defense counsel then asked for a repoll, which the court granted. This time, when the other jurors again repeated their original responses, Mrs. Chatman hesitated:

> THE COURT: June Chatman.

> MRS. CHATMAN: I have to say yes or no?

> THE COURT: Yes, you have to say yes or no. It is yes or no. Did you sign these?

> MRS. CHATMAN: I signed them, yes.

> [DEFENSE COUNSEL]: Objection, your Honor. Could we ask whether or not these were her verdicts?

> THE COURT: Are these your verdicts, Mrs. Chatman?

> MRS. CHATMAN: It's to me, it's the State's verdict.

> THE COURT: Wait a second. Please be seated, [defense counsel]. Did you sign this verdict?

> MRS. CHATMAN: Yes, I did.

> THE COURT: Okay. Londell Smith, please.

> [DEFENSE COUNSEL]: Objection, your Honor. It is not whether she signed· it, is it her verdict?

THE COURT: Please be seated. It is sufficient for this Court. Londell Smith, please.

MR. SMITH: Yes.

Almost certainly, Mapes's trial court erred in accepting Mrs. Chatman's verdict. Although Mrs. Chatman seemed to assent to the verdict the first time she was polled, clearly she did not do so the second time. As the Ohio cases discussed above demonstrate, a juror may indicate her assent to a guilty verdict, but when the assent is conditional or hints at coercion, the trial judge is obligated to inquire further. Mrs. Chatman admitted to signing the verdict forms; however, this is insufficient under *Brown.* A juror may change her mind at any time before the verdict is entered, and that is what may have happened here. Mrs. Chatman's assent, if given at all, was not unequivocal. At the very least, the trial court was required to confirm with Mrs. Chatman that the guilty verdict was hers, or to send the jury back to deliberate further.

*Emmert* does not save the error, but rather seems to confirm it. In that case, the jurors equivocated, and the trial court properly inquired further. Although the preferred resolution probably would have been to send the jurors back to deliberate further, the court avoided the worst resolution, which was to enter the guilty verdict based on the verdict *form* alone. After questioning by the trial court, which the Ohio Supreme Court noted was not coercive, both *Emmert* jurors unambiguously assented to the verdict.

Here, Mrs. Chatman equivocated, she was not questioned further, and her verdict was accepted based on the fact that she had signed the form.

As with the other trial errors we have discussed above, however, this assignment of error has been forfeited unless appellate counsel was unconstitutionally ineffective in failing to raise it—a matter we shall address in due course.

### 5. Exclusion of Evidence Regarding Mapes's Prior Conviction

In this assignment of error, Mapes maintains that the trial court erred in ruling that it could not look behind the judgment of conviction on Mapes's New Jersey *non vult* murder plea, and that the error violated Mapes's right to due process and his right to be free from cruel and unusual punishment. According to Mapes, New Jersey law allows such judgments to be collaterally attacked when two criteria are met: (1) the plea was entered in order to avoid a possible death sentence, and (2) the record demonstrates a realistic possibility that the defendant did not commit murder. Mapes contends that his plea *was* entered to avoid the death penalty— even though New Jersey's death-penalty statute had been ruled unconstitutional by the New Jersey Supreme Court—because the U.S. Supreme Court had not yet ruled on a petition for *certiorari*, and could have reinstated a death sentence, had one been imposed.

Mapes further contends that several factors demonstrate he lacked the culpability to be convicted of the New Jersey murder. First, the New Jersey sentence was consistent with a conviction for manslaughter. Second, Mapes's explanation for his involvement in the New Jersey murder demonstrates at worst that he committed manslaughter. Third, Mapes has produced sufficient evidence of his contentions, including the New Jersey police report and the statements of others involved in the crime.

In Ohio, to be eligible for the death penalty a defendant must be found guilty of aggravated murder and at least one death specification. *See* Ohio Rev.Code Ann. § 2929.04(A). Thus, a defendant who "[p]rior to the offense at bar ... was convicted of an offense an essential element of which was the purposeful killing of or attempt to kill another ...." may be sentenced to death if both judge and jury find that the death-specification circum-

stance outweighs any mitigating circumstance. § 2929.04(A)(5).

Quite simply, it is irrelevant, for purposes of Ohio Revised Code Ann. § 2929.04(A)(5), whether Mapes, in fact, killed someone in New Jersey. The specification does not apply to those who have previously killed others, but to those who have *been convicted of a prior killing*. There is no dispute that this condition was satisfied. The court properly excluded Mapes's proffered evidence on this issue because it is irrelevant.

## B. Effectiveness of Trial Counsel

Mapes identifies four errors allegedly committed by his trial counsel: (1) failing to conduct any investigation into mitigation factors; (2) failing to object to the trial judge's misleading jury instructions and the trial judge's erroneous response to the sentencing jury's questions; (3) having no trial strategy other than being rude and abusive; and (4) failing to request a lesser-included-offense instruction.

■■■ In order to establish a Sixth Amendment violation, it must be shown both that counsel's representation fell below an objective standard of reasonableness, and his deficiencies prejudiced the defendant. *See Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In considering the second, "prejudice" prong of its test, the *Strickland* Court noted that even professionally unreasonable errors "do[ ] not warrant setting aside the judgment of a criminal proceeding if the error[s] had no effect on the judgment." *Id.* at 691, 104 S.Ct. 2052. *But see United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). Except in certain limited circumstances, "ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice." *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052. The Court explained, that to do so,

[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding. Virtually every act or omission of counsel would meet that test, and not every error that conceivably could have influenced the outcome undermines the reliability of the result of the proceeding. . . .

On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. . . .

. . . . .

. . . [T]he appropriate test for prejudice finds its roots in the test for materiality of exculpatory information not disclosed to the defense by the prosecution, and in the test for materiality of testimony made unavailable to the defense by Government deportation of a witness. The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 693–94, 104 S.Ct. 2052 (citations omitted).

■■■ The issues regarding counsel's performance during the *guilt* phase of Mapes's trial may be dismissed on the basis that the evidence of Mapes's guilt was overwhelming. That is, even assuming that trial counsel was not reasonably effective, Mapes can establish no prejudice. There is almost no chance that the verdict would have been different but for counsel's allegedly defective performance. Mapes admitted to taking part in the robbery, he was identified by eyewitnesses as the person who shot Allen, and corroborating evidence was admitted indicating he was the shooter. In light of this, there is no reasonable probability that different actions or a different strategy by counsel could have avoided a guilty verdict.

■ Mapes also fails to show any prejudice arising from counsel's alleged failure to obtain mitigation evidence besides that relating to the New Jersey killing. Mapes claims that counsel did no investigation in this regard, but the sworn statements he has produced as support for this contention merely show that certain persons were not contacted. Mapes does not indicate why these persons should have been contacted, or what mitigating evidence they would have supplied if they had been. He does not show that there was any mitigating evidence overlooked by trial counsel, let alone whether the discovery of such evidence would probably have inclined the jury to eschew a death-sentence recommendation.

On the other hand, the issue regarding the development of the New Jersey evidence is close. Under the Ohio statute, a capital defendant found guilty of a death specification has to present *some* mitigating evidence in order to avoid the death penalty. If a jury has nothing to weigh against the aggravating circumstance, it almost certainly must find that the aggravating circumstance outweighs the (nonexistent) mitigating circumstances, and recommend death.

The only evidence actually presented by trial counsel that could have saved Mapes from a death sentence was Mapes's unsworn statement that he was not the triggerman in New Jersey. However, it appears that other evidence was available to corroborate Mapes's unsworn contention. That is, the record suggests that a man named Elliott Hampton was the triggerman in New Jersey. For instance, Hampton himself states that he is serving a life sentence after being convicted as the triggerman in that crime. And, another New Jersey accomplice states that Hampton, not Mapes, shot the New Jersey victim. Mapes's Ohio accomplice, Rodney Newton, has recanted his trial testimony that Mapes admitted being the New Jersey triggerman. Finally, although it is not in the record, the New Jersey police report

purportedly concludes that Hampton, not Mapes, was the shooter. In his *habeas* petition, Mapes has provided the affidavits of three Ohio Public Defender Commission investigators who have sworn that they reviewed the police report and that it indicates Hampton was the triggerman.

■ Certainly, trial counsel must commit a serious error to be judged unconstitutionally ineffective. However, when a client faces the prospect of being put to death unless counsel obtains and presents *something* in mitigation, minimal standards require some investigation. The record indicates no such efforts by Mapes's counsel. And, even the little mitigation presented—Mapes's unsworn statement—could have been significantly corroborated by the evidence later gathered by Mapes's present counsel. There is no reason to believe this evidence was not available to trial counsel. Admittedly, whether Mapes was or was not the triggerman in the New Jersey killing is slim evidence of mitigation, but it is *something*. And what is most important, it was Mapes's *only* shield from a death sentence. Moreover, the New Jersey murder conviction was what made Mapes eligible for the death penalty in the first place. Therefore, the evidence that he was not the shooter was certainly relevant as to his overall culpability. One is left with the strong impression that trial counsel, after hearing the guilty verdict with the death specifications, merely threw up his hands and conceded that his client would be put to death.

As we concluded above, the jury was wrongly precluded from even *considering* Mapes's unsworn statement concerning the New Jersey homicide as mitigating whether he deserved execution; it was erroneously required to reach unanimity on the death recommendation before considering a life sentence; and there is a good possibility that the sentencing jury was *not*, in fact, unanimous. Thus, when these errors are considered together with trial counsel's failure to investigate any mitigat-

ing factors, prejudice is almost self-evident.

To reiterate, however, this error too has been forfeited by Mapes's failure to raise it on appeal. It is relevant only insofar as it bears on the question whether appellate counsel was unconstitutionally ineffective in failing to raise it, an issue we turn to now.

## C. Effectiveness of Appellate Counsel

Mapes contends that his appellate counsel was unconstitutionally ineffective because he failed to raise the following arguments on appeal: (1) trial counsel was ineffective; (2) the jury was erroneously instructed that its death sentence would only be a recommendation; (3) the jury was erroneously instructed that it had to unanimously reject a death sentence before it could consider a term of years; (4) the jury was not, in fact, unanimous on its death verdict; and (5) the sentencing jury was wrongly precluded from considering relevant mitigating evidence. Additionally, sixth, Mapes contends that his appellate attorney did not competently argue the constitutional issue regarding whether Mapes could be sentenced to death absent a finding that he intended to kill Allen.

We are satisfied that Mapes's counsel's failure to raise issues (2) and (6) above—(2) whether the jury's role was merely to "recommend" the death sentence, and (6) whether the jury found that Mapes intended to kill John Allen—was not unconstitutionally ineffective representation. As to the former, the jury's death sentence verdict *was* merely a recommendation. As to the latter, the jury *did* find that Mapes intended to kill Allen. The specific intent inherent in the aggravated-murder charge is supported by sufficient evidence, and the allegedly inconsistent verdicts on the specifications are irrelevant on this point. The finding of Mapes's specific intent to kill supports the murder conviction and brings the imposition of the death penalty within constitutional limits. Counsel could not be unconstitutionally ineffective for failing to raise these meritless arguments.

However, appellate counsel's failure to raise the trial errors surrounding the death sentence, most of which were objected to by trial counsel, is almost inexplicable. To summarize: (1) trial counsel apparently did no mitigation investigation, and presented no mitigation defense save an unsworn and uncorroborated statement by Mapes that he was not the New Jersey triggerman, even though corroborating evidence almost certainly existed; (2) over trial counsel's objection, the trial judge erroneously prohibited the sentencing jury from considering Mapes's only mitigating evidence, effectively requiring the jury to recommend death; (3) the trial judge erroneously required the jury to reject the death penalty unanimously before considering a life sentence; and (4) over trial counsel's objection, the court accepted a death recommendation from the jury despite one juror's obvious hesitation.

The cases decided by this court on the issue of ineffective assistance of appellate counsel suggest the following considerations that ought to be taken into account in determining whether an attorney on direct appeal performed reasonably competently.

(1) Were the omitted issues "significant and obvious"?

(2) Was there arguably contrary authority on the omitted issues?

(3) Were the omitted issues clearly stronger than those presented?

(4) Were the omitted issues objected to at trial?

(5) Were the trial court's rulings subject to deference on appeal?

(6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

(7) What was appellate counsel's level of experience and expertise?

(8) Did the petitioner and appellate counsel meet and go over possible issues?

(9) Is there evidence that counsel reviewed all the facts?

(10) Were the omitted issues dealt with in other assignments of error?

(11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

See *Moawad v. Anderson*, 143 F.3d 942, 948 (5th Cir.), *cert. denied*, —— U.S. ——, 119 S.Ct. 383, 142 L.Ed.2d 316 (1998); *Bethea v. Artuz*, 126 F.3d 124, 126 (2d Cir.1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 1092, 140 L.Ed.2d 148 (1998); *Mason v. Hanks*, 97 F.3d 887, 893–94 (7th Cir. 1996); *Sistrunk v. Vaughn*, 96 F.3d 666, 670–71 (3d Cir.1996); *Parker v. Bowersox*, 94 F.3d 458, 462 (8th Cir.1996), *cert. denied*, 520 U.S. 1171, 117 S.Ct. 1439, 137 L.Ed.2d 545 (1997); *McBride v. Sharpe*, 25 F.3d 962, 973 (11th Cir.1994); and *Mayo v. Henderson*, 13 F.3d 528, 533 (2d Cir.1994).

Manifestly, this list is not exhaustive, and neither must it produce a correct "score"; we offer these inquiries merely as matters to be considered.

Applying them to Mapes's case, it appears that most of the factors fall in Mapes's favor. First, the issues omitted were significant and probably obvious. Although some of the cases cited were published after the appellate brief was submitted, nevertheless, by 1984:(1) Ohio's death-penalty statute did not require unanimous rejection of a death sentence before a jury could consider a life sentence, and in fact implied the opposite; (2) the Supreme Court had indicated that *all* relevant mitigating evidence, including evidence relating to a defendant's prior criminal record, must be considered by a sentencing jury; (3) *State v. Brown, State v. Fields*, and *Emmert v. State* all indicated that a trial judge must inquire further of an equivocating polled juror or send the jury back for further deliberations; and (4) the Sixth Amendment required that a defendant receive reasonably effective counsel at all stages of the proceedings. These errors should have been obvious in 1984; moreover, there appears to be no authority that would have tempered counsel's enthusiasm for bringing them, satisfying the second criterion.

Third, these issues were clearly stronger than some of those presented. Appellate counsel brought 12 assignments of error, indicating that winnowing of issues was not a primary consideration. And all but one of these assignments pertained to the guilt phase, despite the overwhelming evidence of Mapes's guilt. In fact, the Ohio Court of Appeals expressly relied on the strength of the evidence in finding some errors harmless. Moreover, as the Ohio Court of Appeals' opinion demonstrates, several of the assignments were almost entirely meritless.

Fourth, the lack-of-unanimity and prohibition-of-mitigating-evidence issues were objected to at the sentencing phase. Concededly, it is unclear whether trial counsel objected to the court's erroneous instruction that the jury must *unanimously reject* the death penalty before considering a life sentence. But trial counsel's other objections should have prompted appellate counsel to investigate and raise those issues. Fifth, many of these omitted issues would have been subject to *de novo* review upon appeal. Thus, appellate counsel cannot have strategically reasoned that a court of appeals would defer to the trial court's rulings.

Sixth, appellate counsel has never been asked to defend his decisions, thus we can only guess what his reasons were for having failed to raise these issues. Similarly, we can only speculate whether he in fact read all the sentencing transcript. Seventh, the record does not reflect the level of appellate counsel's experience and expertise. Eighth, there is no evidence that Mapes and his appellate counsel met and discussed possible issues; nor is there evidence, ninth, that counsel knew all the relevant facts. Although we have not been

provided Mapes's direct-appeal briefs, we note that the court of appeals did not mention in its opinion any of the facts pertinent to the omitted issues. This indicates that appellate counsel may not have discussed these facts either. Tenth, the omitted issues were not dealt with in other assignments of error.

Finally, eleventh, there seems to be no reasonable justification for omitting these issues. We find entirely plausible Mapes's contention that his appellate counsel did not read the entire sentencing transcript, as the attorney appears to have addressed every other conceivable nonsentencing argument in his brief. Interestingly, the Eleventh Circuit has held it unreasonable as a matter of law to fail to review a sentencing transcript where trial counsel made colorable objections. *See Joiner v. United States*, 103 F.3d 961, 963 (11th Cir.), *cert. denied*, 520 U.S. 1246, 117 S.Ct. 1857, 137 L.Ed.2d 1058 (1997).

 Importantly, Mapes has not forfeited his right to a hearing on this issue, because he properly raised it on post-conviction review and Ohio courts erroneously refused to consider it. As we have noted, the trial court declined to conduct postconviction review because it believed it could not pass on the validity of the court of appeals' direct-review decision. If the trial court had found ineffective assistance of appellate counsel, it would have had to vacate the appellate judgment, a result which the court felt was beyond its authority. Inexplicably, the court of appeals rejected the ineffective assistance of appellate counsel argument *because the trial court was correct in its opinion that it did not have the power to review the claim.* It was thus that the erroneous circular reasoning was concluded. The Ohio Supreme Court did not discuss any of the merits upon post-conviction review. Consequently, Ohio's procedural ground for denying review of this claim is not "adequate" and cannot obviate the need for review of the constitutional merits. In light of the strong possibility that Mapes's Sixth

Amendment rights in this regard were violated, he is entitled to have his ineffective-assistance-of-counsel argument heard in the federal district court.

Of course, even if counsel is found to have been ineffective, prejudice must still be shown. However, considering that all four errors concern the sentencing phase and that juror Chatman almost certainly did not favor a death recommendation, we think there is a "reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *See Strickland*, 466 U.S. at 695, 104 S.Ct. 2052.

## IV.

We conclude that Mapes may not have received, on direct appeal, the assistance of counsel which the Sixth Amendment guarantees. Thus, we **REVERSE, IN PART**, and **REMAND** this case for an evidentiary hearing so that the district court may evaluate appellate counsel's performance in light of the factors we have discussed. The district court's judgment denying the petitioner's claims in all other respects is hereby **AFFIRMED**.

SILER, Circuit Judge, concurring in part and dissenting in part.

I concur in the majority opinion on all issues except that pertaining to the effectiveness of appellate counsel. I also concur with the conclusion by the majority that Mapes has sufficiently raised the question of ineffective assistance of appellate counsel by the failure to raise on appeal the trial court's instruction that in the sentencing phase, "the mitigating factors do not apply to the prior murder conviction at all." That issue appears to have had validity at the time of the trial. *See Eddings v. Oklahoma*, 455 U.S. 104, 113–114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). Agreeing with the majority, I would remand that issue for an evidentiary

hearing, so that appellate counsel, if he can recall, may explain why he failed to raise that issue on appeal. He may have had strategic reasons for omitting the issue, or his client may have requested that it be omitted. Because no court has yet heard testimony from appellate counsel on that question, it is appropriate for the district court to decide whether appellate counsel's performance met the test under *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

However, I depart from the decision by the majority to remand this matter to the district court for consideration of ineffective assistance of appellate counsel for failing to raise the other issues, to-wit, (1) ineffective assistance of trial counsel; (2) other jury instructions requiring the jury to reject the death penalty unanimously before considering a life sentence; and (3) the hesitation of Juror Chatman to reply in a more positive matter at the time of the jury poll.

The general principles of ineffective assistance of counsel bear repeating, to some degree. First, there is a strong presumption that counsel was constitutionally effective. *Strickland*, 466 U.S. at 688, 104 S.Ct. 2052. Second, counsel decides which issues to pursue on appeal and there is no duty to raise every possible claim. *See Jones v. Barnes*, 463 U.S. 745, 751–52, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). The "process of 'winnowing out weaker arguments on appeal and focusing on' those most likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986) (quoting *Jones v. Barnes*, 463 U.S. at 751–52, 103 S.Ct. 3308). Finally, "[e]ffective advocacy does not require the appellate attorney to raise every non-frivolous issue under the sun, of course." *Mason v. Hanks*, 97 F.3d 887, 893 (7th Cir.1996) (citing *Jones v. Barnes*, 463 U.S 745, 103 S.Ct. 3308). These principles require that the court find that a particular omission of counsel both was not

only ineffective but that the omission prejudiced the defendant, thus rendering the proceeding fundamentally unfair and the result unreliable. *See Strickland*, 466 U.S. at 687, 104 S.Ct. 2052. This is why the district court must hold a hearing, to give the petitioner an opportunity to call his appellate counsel and allow him to explain the omission of the issue discussed herein. *See Sistrunk v. Vaughn*, 96 F.3d 666, 671 (3d Cir.1996).

On the other issues concerning the ineffective assistance of appellate counsel, I would uphold the decision of the district court. The majority has raised the issue of the ineffective assistance of counsel on appeal because he did not raise the question of ineffective trial counsel for their failure to conduct a mitigation investigation and present a mitigation defense other than Mapes's statement. I agree with the district court's conclusion that Mapes has not shown that trial counsel was ineffective at the sentencing phase, so appellate counsel could not have been ineffective in failing to raise this issue on direct appeal. The affidavits of an attorney and a mitigation specialist do not show what mitigating evidence could have been produced that was not. In addition, although Mapes has presented some evidence that he was not the trigger man in the New Jersey homicide, this evidence was not discovered until 1987, and there is no proof that defense counsel could have discovered it at trial. As to the references to the New Jersey police report, the petitioner has not even yet produced copies of it. Finally, the trial court instructed the jury, anyway, that it was not to consider any mitigating factors pertaining to the New Jersey murder. Therefore, if the trial court's instruction effectively precluded the jury from considering any mitigation in connection with the New Jersey homicide, then such evidence could not have been introduced.

Next, I dissent from the conclusion of the majority that appellate counsel was ineffective for failing to raise the issue that the trial court's instructions were errone-

ous by requiring the jury to reject the death penalty unanimously before considering a life sentence. I agree with the district court that the instruction by the court was in accordance with the language from R.C. § 2929.03(D)(2). Obviously, according to the majority opinion, *State v. Brooks*, 75 Ohio St.3d 148, 661 N.E.2d 1030, 1041 (1996), later indicated that similar language was erroneous. However, *Brooks* was decided many years after the trial of this case, and it cited for authority *Mills v. Maryland*, 486 U.S. 367, 376–377, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988). Thus, at the time of the trial here, there was no authority that such an instruction was erroneous under Ohio law. It was even said in *Brooks*, 661 N.E.2d at 1042: "In Ohio, a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors. Jurors from this point forward should be so instructed." Thus, it appears that *Brooks* was stating that the law which affected that particular case was to be considered prospectively only. Mapes in this case cites *State v. Thomas*, 40 Ohio St.3d 213, 533 N.E.2d 286 (1988), as authority that this instruction was erroneous, but *Thomas*, as analyzed by the district court, involved the guilt phase of a trial and involved a lesser-included offense, which is not the situation here. Thus, *Thomas* is not applicable to this case. It is not ineffective assistance of counsel when counsel fails to anticipate a change in the law. *See Sistrunk*, 96 F.3d at 671.

Finally, I also dissent from the conclusion of the majority that the district court should conduct a hearing on the failure of appellate counsel to inquire further into the poll of the jury. During the poll, Mrs. Chatman, the juror, said that she signed the verdict. In response to the court's question, "Are these your verdicts, Mrs. Chatman," she replied, "It's to me, it's the State's verdict." Although the court could have returned the jury to the jury room for further deliberation, receiving the verdict under the circumstance was not erroneous. I disagree with the majority that *State v. Fields*, 176 N.E.2d 845, 849–50 (Oh.Ct.App.1960); *State v. Brown*, 110 Ohio App. 57, 168 N.E.2d 419 (Oh.Ct.App. 1953); and *Emmert v. State*, 127 Ohio St. 235, 187 N.E. 862 (1933), hold to the contrary. Although the issue is one which could have been raised on appeal, the failure to do so does not constitute ineffectiveness of counsel. That issue was not a "dead-bang winner" as used by one of our sister circuits, in describing an issue that is obvious from the trial record (and one which would probably have resulted in a reversal on appeal). *See Banks v. Reynolds*, 54 F.3d 1508, 1515 n. 13 (10th Cir. 1995). Appellate counsel did a commendable job on direct appeal in this case. He raised twelve issues. Although, in hindsight, we now criticize the brief for not raising other issues, the only question which arguably should have been raised is that pertaining to consideration of mitigation evidence surrounding the homicide in New Jersey. Even the failure to raise that issue may be excused after a hearing in the district court when appellate counsel has an opportunity to explain how he conducted the case. The difficulty in this case will be whether the attorney can even remember why he did certain things on appeal, for the direct appeal concluded in 1985. It would be very hard for any of us to explain our conduct which occurred some thirteen years ago.

Therefore, I would affirm the decision of the district court, except to the extent that the remedy provided would be to conduct a hearing on the failure of appellate counsel to raise the question concerning mitigating factors in the murder conviction. Then, the district court would be able to determine if the failure of appellate counsel to raise that issue on appeal constituted ineffective assistance of counsel under *Strickland*.