IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
April 22, 2015 Session

## STEVEN D. HILL v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Maury County**
**No. 20740    Robert L. Jones, Judge**

---

**No. M2014-00999-CCA-R3-PC – Filed July 10, 2015**

---

A Maury County jury convicted petitioner, Steven D. Hill, of aggravated arson, aggravated burglary, and theft over $1,000. The trial court sentenced him to an effective term of twenty years. He unsuccessfully appealed his convictions to this court and subsequently filed a petition for post-conviction relief. The post-conviction court denied relief. On appeal, petitioner alleges that he received ineffective assistance of counsel on direct appeal. Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROGER A. PAGE, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ALAN E. GLENN, JJ., joined.

Dan R. Alexander, Nashville, Tennessee, for the appellant, Steven D. Hill.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Brent A. Cooper, District Attorney General; and Kyle E. Dodd, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Facts

Petitioner was indicted for aggravated arson, aggravated burglary, reckless endangerment, and theft over $1,000 after he broke into Danny Bradley's house, stole his knives and medications, and set his bedroom on fire. *State v. Steven Dale Hill*, No. M2012-00982-CCA-R3-CD, 2013 WL 1092724, at *1-7 (Tenn. Crim. App. March 15, 2013). The reckless endangerment count was dismissed prior to trial, and petitioner was convicted as charged of the remaining offenses. *Id.* at *1.

Because the central issue on direct appeal and in this post-conviction proceeding concerns the status of a trial witness, Tammy Owens, as an accomplice, we set forth her trial testimony as summarized by this court on direct appeal:

> Ms. Ta[mm]y Owens testified that the [petitioner] was her "best friend" and "big brother." She testified that they had been friends with each other since she was thirteen. Ms. Owens testified that although she was presently "clean," in January of 2011, she had a drug problem involving "pills, meth, a lot of different things."
>
> Ms. Owens testified that on January 31, 2011, she drove her van over to the [petitioner]'s house around 1:00 p.m. She testified that she picked up the [petitioner] to "[j]ust ride around." During this period of time, the two were talking and doing drugs. The [petitioner] had a backpack with him. She testified that the [petitioner] was driving.
>
> Ms. Owens testified that after they left, the [petitioner] told her that they were going "[t]o make some money" and headed toward Highway 7. The [petitioner] drove her to a specific house to which she had not been previously, and they parked in the front. Ms. Owens testified that the [petitioner] exited the van and went to the front door of the house, while she remained inside. The [petitioner] then entered the house using a screwdriver. Ms. Owens testified that she remained in the van for approximately five or ten minutes, and then she got out to retrieve the [petitioner].
>
> Ms. Owens testified that she did not know what the [petitioner]'s plans were before they arrived at the house. Even after they arrived and she witnessed his forcible entry into the residence, she still did not "completely" know the [petitioner]'s plans—she simply "knew it wasn't right."
>
> Ms. Owens testified that she entered the residence through the same door as the [petitioner]. Once she entered the house, she walked through it until she reached the bedroom, where she saw the [petitioner] "stealing and setting the house on fire." Specifically, she saw the [petitioner] putting objects into his backpack, including "Mule Day knives, little pocket knives." She also saw the [petitioner] taking bottles of medication. After he had finished, she saw the [petitioner] take a small yellow bottle out of his backpack, pour liquid from it onto some clothes, and ignite the mixture with a Zippo lighter. Ms. Owens testified that while witnessing this she

backed out of the bedroom and asked the [petitioner] what he was doing. He responded that "he was going to burn it."

Ms. Owens testified that she ran out of the house and back to the van. The [petitioner] followed her less than a minute later. Ms. Owens testified that the [petitioner] drove them away from the scene. When she asked the [petitioner] why he had set the fire, he explained to her that the victim owed him some money.

Ms. Owens testified that they drove to her mother's house so that she could change her clothes and they could leave, arriving there around 3:00 p.m. Ms. Owens testified that after they arrived they encountered her brother. Her brother threatened the [petitioner], who threatened him in return. During this argument, she heard the [petitioner] threaten to burn her brother's house down. Ms. Owens testified that she left with the [petitioner], and she never considered leaving or calling the police because she was afraid of him.

Ms. Owens testified that she and the [petitioner] drove around for the remainder of the day using drugs. She testified that they used both marihuana and methamphetamine. The [petitioner] was behind the wheel. She testified that they eventually stopped at an abandoned church, where they both slept in the van. The next day, she returned to her mother's house to shower, leaving the [petitioner] asleep in the van. They left some hours later and she drove the [petitioner] to meet his girlfriend. After meeting Ms. [Lourie] Corley, the [petitioner] left with her, and Ms. Owens did not see him again for a week.

During the intervening time, the [petitioner] called her several times and requested that she bring him some CDs, but she did not do so because she was afraid of him. She eventually ran into the [petitioner] while she was running errands, and she pulled over and gave him his CDs. After the exchange, she continued to stay away from the [petitioner] out of fear for her safety. The [petitioner] eventually caught up with her while she was parked at a Waffle house, and he got into her van.

Ms. Owens testified that the [petitioner] had a knife in his hand. The [petitioner] told her to drive, and she did so. The [petitioner] told her where to turn as they drove. Ms. Owens testified that the [petitioner] threatened her because he thought that she "was going to tell on him." She told the [petitioner] that she would not do so. They eventually stopped at a local store, which was closed for the evening, and the [petitioner] took over as

driver. The [petitioner] threatened her again and told her to get out of the van, and she did so. Then, the [petitioner] pulled away in her vehicle before "c[oming] back at [her] like he was going to hit [her] with the car." He drove away afterward. Ms. Owens testified that she started walking home until she was eventually picked up by a stranger.

Ms. Owens testified that while she was on her way home she saw her van in the parking lot of a Baptist Church, surrounded by police. She asked for the stranger to drop her off there so that she could ask the police for assistance. The police brought her back to the police station for questioning, where she gave two statements. Ms. Owens testified that in her first statement, she did not tell the police the whole story. She simply claimed to have dropped the [petitioner] off at a church near the victim's house on the day in question. Ms. Owens testified that she lied in this statement because she was afraid of the [petitioner] and of getting in trouble. Ms. Owens testified that she gave a second, truthful statement to police the next morning.

On cross-examination, Ms. Owens testified that the [petitioner] never referred to the victim specifically by name. She first learned exactly whose house had burned down when her mother told her two or three days later, after reading about the fire in the paper. Ms. Owens testified that after arriving at the victim's house on the day in question, she made the decision to exit the van because she knew that the [petitioner] had just broken into someone else's house, and she did not want to be sitting in the van with no keys if someone else came by. She testified that she got out to tell the [petitioner] to "come on," because she did not want to get into trouble.

Ms. Owens denied that following the robbery, while she and the [petitioner] were smoking weed and meth, she had ever suggested going through the victim's pills to see what she and the [petitioner] had obtained. Ms. Owens also insisted that the only reason that she left the Waffle House with the [petitioner] was because he had abducted her at knife point. She added that before he let her leave that evening, the [petitioner] took away her shoes. Ms. Owens testified that numerous individuals knew that she was going to be at the Waffle House that evening, as she was going there to apply for a job. Ms. Owens testified that she told the police about the [petitioner] abducting her, but she acknowledged that her written statement to the police made no reference to the abduction.

The witness was also questioned extensively concerning discrepancies between her two written police statements and her trial testimony. In particular, Ms. Owens was questioned concerning a statement that she made in her second written police statement that seemed to indicate that she had been the one who had driven the van to the victim's house, as well as a statement to the effect that the [petitioner] had "told [her] in the beginning he was only going into the home to take medications." Ms. Owens testified that those statements had been misunderstood. Ms. Owens also denied telling various other individuals that someone other than the [petitioner] had burned down the house. Before leaving the stand, Ms. Owens acknowledged that she had been charged concerning the theft of the victim's knives and medicines and that her case was still in General Sessions court.

*Id.* at *3-5.

In his direct appeal, petitioner challenged the sufficiency of the evidence based on Ms. Owens' credibility and also argued that the trial court erred in its jury instruction regarding accomplice testimony. *Id.* at *8-9. This court determined that the evidence was sufficient to support his convictions and that the trial court's jury instruction was proper. *Id.* In concluding that the trial court's jury instruction was proper, this court made the following observations:

The record is clear that Ms. Owens disputed her status as the [petitioner]'s willing accomplice. Her testimony at trial was that she did not know that the [petitioner] was going to steal, burglarize, or set fire to the victim's house until after she discovered him accomplishing those very acts inside. She testified that when she saw the [petitioner] committing those criminal acts, she asked him why he was doing them. She testified that she stayed with the [petitioner] after he committed the criminal acts only out of fear for her own safety. Simply put, no portion of Ms. Owen[s'] trial testimony can be reasonably construed as a concession that she willingly participated in the [petitioner]'s crimes.

The [petitioner] directs our attention to Ms. Owens' written statement to police, in which she made statements that appear to concede that she had advance knowledge of the [petitioner]'s intent to commit theft (at least). For example, Ms. Owens stated to the police that the [petitioner] "told me at the beginning he was only going into the home to take medications." Had Ms. Owen[s'] trial testimony echoed some or all of the seemingly inculpatory statements contained in her written police statement, this court might confront a different set of facts. However, as the record

-5-

stands, these prior inconsistent statements served, at most, to call the credibility of Ms. Owens' trial testimony into question and raise a factual dispute concerning her status as an accomplice. The trial court properly submitted this factual dispute to the jury and gave the appropriate instructions. By its verdict, the jury either resolved the issue of whether Ms. Owens was an accomplice against the [petitioner], found that Ms. Owens' testimony was sufficiently corroborated by other evidence, or both.

Even had the record reflected Ms. Owen[s'] undisputed status as a willing participant in the [petitioner]'s crimes—thereby rendering the trial court's failure to instruct the jury that Ms. Owens was an accomplice an error—the [petitioner] would still not be entitled to relief. It is well-established that even when record evidence exists that would support a finding that a witness is an accomplice, and the trial court fails entirely in its duty to instruct the jury concerning accomplice testimony, such an error is subject to harmless error analysis. *See* [*State v. Ballinger*, 93 S.W.3d 881, 888 (Tenn. Crim. App. 2000)]. It necessarily follows that a lesser instructional error—such as permitting the jury to determine whether or not a witness is an accomplice rather than instructing them that the witness is to be deemed an accomplice—is also subject to harmless error analysis. We will find such an error to be harmless when "the record contains sufficient corroboration to [the accomplice's] testimony." *Id.*

The State presented sufficient evidence at trial to corroborate Ms. Owens' testimony. "[C]orroborating evidence is sufficient if it connects the accused with the crime in question." *State v. Griffis*, 964 S.W.2d 577, 589 (Tenn. Crim. App. 1997). Ms. Owen's brother testified that he saw the [petitioner] in the company of his sister less than an hour after the fire and that the [petitioner] became hostile during this encounter and threatened to burn down his house. Ms. Osann testified that the [petitioner] later admitted to her that he "burned the house down" because the "son of a [expletive] owed me money." This testimony sufficiently connects the [petitioner] to the crimes at issue. Consequently, any failure to properly instruct the jury concerning Ms. Owens' status as an accomplice or the need for her testimony to be corroborated would have been harmless. The [petitioner]'s claim that the trial court erred by failing to instruct the jury that Ms. Owens was an accomplice as a matter of law is denied.

*Id.* at *9-10.

No further appellate action was taken following this court's denial of petitioner's appeal. Subsequently, petitioner filed a petition for post-conviction relief in which he

alleged that he received ineffective assistance of counsel when counsel did not raise all viable issues on appeal and when counsel failed to either properly withdraw from his case or to seek further appellate review.[1]

At the post-conviction hearing, petitioner testified that the only time that he saw trial counsel[2] prior to his trial was for twenty minutes just a few days before his trial. He did not have an opportunity to discuss his appeal with trial counsel nor did he receive any communication from trial counsel about his appeal. He said that he learned about the disposition of his appeal when Lourie Corley brought his case record to him. A copy of this court's opinion was included in the record along with a letter from trial counsel stating that he had "sixty days to file a request with the Supreme Court." Petitioner testified that he was aware that the jury instruction regarding accomplice testimony was a contested issue at trial. At this point in petitioner's testimony, post-conviction counsel drew the post-conviction court's attention to a segment of the trial record, which was made an exhibit to the hearing, and the post-conviction court read an excerpt aloud. In the excerpt, the trial court stated that it had received a question from the jury: "[D]oes the jury have to be unanimous in our belief that a witness is an accomplice or not; if not, if one of us thinks she is an accomplice, do we all have to discount her testimony[?]" The trial court then instructed the jury:

> [E]very required element of a crime being considered by the jury must be proven beyond a reasonable doubt to the satisfaction of all twelve jurors; in order to find the defendant guilty of that crime, you are further instructed that if any juror finds that Tammy Owens is an accomplice on any count, then that juror must find other evidence completely independent of the testimony of Tammy Owens to support or corroborate the defendant's involvement in the commission of a crime for that count; any independent or corroborated evidence need not be strong enough on its own to prove guilty beyond a reasonable doubt if all the evidence as a whole convinces that juror beyond a reasonable doubt that the defendant is guilty of that crime. . . . [A]ny juror finding that Tammy Owens is not an accomplice on a particular crime can find the defendant guilty of that crime if all the elements of the crime are proven beyond a reasonable doubt to the satisfaction of that juror, even if all that evidence is from Tammy Owens alone.

---

[1] Petitioner also alleged that the State committed a *Brady* violation, but he has not pursued this issue on appeal. Therefore, we will limit our summary of the post-conviction hearing testimony to the remaining appellate issues.

[2] Trial counsel represented petitioner at trial and on appeal.

Petitioner then testified that he was unaware that he could have asked this court to re-hear his direct appeal if he believed that the court based the opinion on an incorrect factual determination.

The post-conviction court determined that trial counsel provided ineffective assistance by not seeking second-tier appellate review or properly withdrawing from petitioner's case. However, the post-conviction court further determined that trial counsel did not provide ineffective assistance on appeal by failing to raise the issue of juror unanimity regarding accomplices when trial counsel argued on appeal that the trial court erred in its accomplice jury instructions and when any argument about jury unanimity on accomplice testimony would have been "groundbreaking." Therefore, the post-conviction court granted relief in the form of an opportunity to seek a delayed appeal to the supreme court but denied petitioner's request for a second first-tier review by this court.[3]

## II. Analysis

On appeal, petitioner asserts that counsel provided ineffective assistance by failing to raise all viable issues on appeal. Specifically, he contends that counsel should have argued on appeal that failure to assure that the jury unanimously agreed on the status of Tammy Owen as an accomplice was a structural constitutional error requiring a new trial and that the trial court's instructions to the jury contributed to this error.[4]

To obtain relief in a post-conviction proceeding, a petitioner must demonstrate that his or her "conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United

---

[3] Tennessee Supreme Court Rule 28 states that the post-conviction court should stay the post-conviction proceedings pending the outcome of the Rule 11 application, and the post-conviction court in this case did not stay the post-conviction proceedings. Tenn. R. Sup. Ct. 28 § 9(D)(1)(b)(i). However, it is clear from the arguments presented to this court that petitioner wished to proceed with the post-conviction proceedings by appealing the post-conviction court's ruling, thereby forgoing his opportunity to file a delayed Rule 11 application. Thus, petitioner has waived any argument that he should be allowed to file a delayed Rule 11 application following this appeal from the post-conviction court's judgment. *See* Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

[4] In his brief, post-conviction counsel further argues that counsel's ineffective assistance began at trial by his failure to object to the trial court's jury instructions given in response to the question submitted by the jury. Post-conviction counsel also asserted at oral argument that multiple errors by counsel at trial required post-conviction relief. However, petitioner has waived appellate review of any alleged errors committed by counsel at trial because, "[a]s a general rule, this court will not address post-conviction issues that were not raised in the petition or addressed in the trial court." *Brown v. State*, 928 S.W.2d 453, 457 (Tenn. Crim. App. 1996).

States." Tenn. Code Ann. § 40-30-103. A post-conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Lane v. State*, 316 S.W.3d 555, 562 (Tenn. 2010) (quoting *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009)). As a mixed question of law and fact, this court's review of petitioner's ineffective assistance of counsel claims is de novo with no presumption of correctness. *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (citations omitted).

The Sixth Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, and article I, section 9 of the Tennessee Constitution require that a criminal defendant receive effective assistance of counsel. *Cauthern v. State*, 145 S.W.3d 571, 598 (Tenn. Crim. App. 2004) (citing *Baxter v. Rose*, 523 S.W.2d 930 (Tenn. 1975)). When a petitioner claims that he received ineffective assistance of counsel, he must demonstrate both that his lawyer's performance was deficient and that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007) (citation omitted). It follows that if this court holds that either prong is not met, we are not compelled to consider the other prong. *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004).

To prove that counsel's performance was deficient, petitioner must establish that his attorney's conduct fell below an objective standard of "'reasonableness under prevailing professional norms.'" *Finch*, 226 S.W.3d at 315 (quoting *Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006)). On appellate review of trial counsel's performance, this court "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." *Howell v. State*, 185 S.W.3d 319, 326 (Tenn. 2006) (citing *Strickland*, 466 U.S. at 689).

To prove that petitioner suffered prejudice as a result of counsel's deficient performance, he "must establish a reasonable probability that but for counsel's errors the result of the proceeding would have been different." *Vaughn*, 202 S.W.3d at 116 (citing *Strickland*, 466 U.S. at 694). "A 'reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). As such, petitioner must establish that his attorney's deficient performance was of such magnitude that he was deprived of a fair trial and that the reliability of the outcome was called into question. *Finch*, 226 S.W.3d at 316 (citing *State v. Burns*, 6 S.W.3d 453, 463 (Tenn. 1999)).

In post-conviction proceedings, we likewise apply the two-prong test of *Strickland* to evaluate claims of ineffective assistance of appellate counsel. *Carpenter*, 126 S.W.3d

at 886. We will not fault appellate counsel for not raising every possible issue on appeal. *Carpenter*, 126 S.W.3d at 887 (citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999); *Campbell v. State*, 904 S.W.2d 594, 596-97 (Tenn. 1995)). Determination of the issues to raise on appeal is a matter left to appellate counsel's sound discretion. *Carpenter*, 126 S.W.3d at 887 (citing *Jones*, 463 U.S. at 751). We accord appellate counsel's professional judgment considerable deference with regard to which issues he believes to be meritorious on appeal. *Id.* As in a review of ineffective assistance of trial counsel, we should not second-guess appellate counsel's decisions and must avoid the distorting effects of hindsight. *Id.* However, we will only defer to counsel's tactical choices if such choices are within the range of competence required of attorneys in criminal cases. *Id.* (citing *Campbell*, 904 S.W.2d at 597).

Moreover,

[i]f a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, as it is in this case, then the reviewing court must determine the merits of the issue. Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it. Likewise, unless the omitted issue has some merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal. When an omitted issue is without merit, the petitioner cannot prevail on an ineffective assistance of counsel claim.

*Carpenter*, 126 S.W.3d at 887-88. Thus, to fully review petitioner's claim of ineffective assistance of appellate counsel, we must first determine whether the underlying issues are meritorious.

Our supreme court has listed several factors to consider when determining the relative merit of an omitted issue, foremost of which is, "Were the omitted issues 'significant and obvious'?" *Id.* at 888 (quoting *Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999)). The omitted issue in this case is one that post-conviction counsel has termed an issue of first impression in this state. Post-conviction counsel found no legal authority directly on point stating that a jury in a Tennessee criminal case must unanimously determine that a witness is or is not an accomplice, and neither has this court. Thus, the omitted issue was not "significant and obvious" because there was no developed law on the issue.

Another factor listed in *Carpenter* is, "Were the omitted issues dealt with in other assignments of error?" *Id.* In this case, the issue presented on direct appeal concerned the trial court's instructions regarding accomplice testimony, an issue which is so entangled with the one petitioner claims should have been addressed that post-conviction counsel re-argued the issue in his post-conviction appellate brief as a necessary

component of his overall argument. Thus, arguably, the issue that petitioner claims was omitted was actually encompassed by the argument presented by appellate counsel on direct appeal. Therefore, evaluating counsel's decision based on the state of the law at the time of the direct appeal, we cannot conclude that appellate counsel's performance fell below an objective standard of reasonableness. We agree with the post-conviction court that a "failure to be groundbreaking" is not ineffective assistance of appellate counsel under the circumstances of this case.

## CONCLUSION

Based on the record, the applicable law, and the arguments of the parties, we affirm the judgment of the post-conviction court.

_____
ROGER A. PAGE, JUDGE