IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 10, 2017 Session

**SANDERS LEE MADEWELL v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County**
**No. 2010-C-2445      J. Randall Wyatt, Jr., Judge**

_____

**No. M2016-00499-CCA-R3-PC**

_____

A Davidson County jury convicted the Petitioner, Sanders Lee Madewell, of especially aggravated robbery and criminal impersonation, and the trial court sentenced him to an effective sentence of seventeen years in prison. On appeal, this Court affirmed the convictions and sentence. *See State v. Sanders Lee Madewell*, No. M2012-02150-CCA-R3-CD, 2012 WL 3129186, at *1 (Tenn. Crim. App., at Nashville, July 31, 2012), *perm. app. denied* (Tenn. Nov. 26, 2012). The Petitioner filed a post-conviction petition alleging that he had received the ineffective assistance of counsel, that the State had withheld evidence favorable to him, that he was "actually innocent", and that the trial court failed in its role as the thirteenth juror. Following a bifurcated hearing, the post-conviction court denied relief. On appeal, the Petitioner maintains the aforementioned issues. After review, we affirm the post-conviction court's judgment.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which THOMAS T. WOODALL, P.J., and ROBERT L. HOLLOWAY, Jr., J., joined.

Susan L. Kay, Vanderbilt Legal Clinic, Tracee Clements and Neil V. Greenwell (specially admitted to practice pursuant to Tennessee Supreme Court Rule 7 § 10.03), Nashville, Tennessee, for the appellant, Sanders Lee Madewell.

Herbert H. Slatery III, Attorney General and Reporter; Clark Bryan Thornton, Senior Counsel; Glenn R. Funk, District Attorney General; and Amy Hunter, Deputy District Attorney General, for the appellee, State of Tennessee.

**OPINION**

This case arises from a robbery that occurred on April 5, 2010, in Nashville, Tennessee, during which the victim had taken from him $40 and suffered a partially severed ear. Several days later, the Petitioner provided investigating officers with a false name. For these offenses, a Davidson County grand jury indicted the Petitioner and his co-defendant for especially aggravated robbery and criminal impersonation. This Court upheld the Petitioner's convictions and sentence on direct appeal. *See Madewell*, 2012 WL 3129186, at *1.

## A. Direct Appeal Facts

On direct appeal, this Court summarized the State's evidence against the Petitioner as follows:

> This case arises out of a robbery, for which the [Petitioner] and a co-defendant, Jacob Harrison Thompson, were indicted and tried together. The victim, Michael Booth, testified that he was assaulted and robbed by three or four men at approximately 12:45 a.m. on April 5, 2010. At the time of the robbery, the victim was homeless and living in a tent about one mile from North First Street in Nashville. The victim testified that he awoke as he was dragged out of his tent by his feet and told that he was trespassing and had to leave. He refused to leave, and the men walked away briefly before returning five to seven minutes later.

> After identifying both the [Petitioner] and Thompson in court as two of the men who attacked him, the victim testified that they forced him at knifepoint to walk toward the nearby railroad tracks. The [Petitioner] walked behind the victim with his hand on the victim's collar, telling him not to turn around. After the victim turned around to face the men, Thompson hit him with a tree branch the size of a baseball bat. The men beat him while he was on the ground and took forty dollars from his front pocket and his cell phone. The [Petitioner] pulled out his knife and held it to the victim's temple. The [Petitioner] "cut[ ] half, probably half of [the victim's] ear off" after the victim sliced his fingers while grabbing for the knife. The attackers ran away when they heard an approaching train blow its horn.

> The victim walked to the TA Truck Stop ("TA"), where he solicited the help of the security guard on duty, who called the police. After the police arrived, the victim was transported by ambulance to the Veterans Administration Hospital, where a plastic surgeon sewed his ear back together. He also received thirty to thirty-five staples in his head and

2

stitches in his fingers. The victim testified that the injury to his ear caused a permanent eighty percent loss of hearing.

The victim returned to the TA on April 11, 2010, and saw the [Petitioner] and Thompson standing outside. The victim immediately told one of the TA employees that he recognized the men as two of his attackers and asked her to call the police. The victim said that the [Petitioner] had done most of the talking during the robbery and that the [Petitioner] had a voice he would never forget. The victim further stated, "I will never forget that face. I will never forget them tattoos, and I will never forget his friend over there either. That was them." He said that he was "100 percent certain" in his identification of the [Petitioner].

The TA security guard, Danny Pennington, testified that the [Petitioner], Thompson, another man, and two women were at the TA on April 4, 2010, and left together around 9:30 p.m., headed toward North First Street. Pennington said that the victim, who had several lacerations and was in "bad shape," came to the truck stop at about 1:00 a.m. After the victim left in the ambulance, Pennington returned to the front of the TA to find the [Petitioner], who told him that two men and two women had bragged about pulling a man out of his tent and beating him up.

Officer Andre Johnson of the Metropolitan Nashville Police Department testified that he arrested the [Petitioner] and Thompson at the TA on April 11, 2010. Two knives were recovered from the [Petitioner's] pockets, and the [Petitioner] initially gave the officer a false name.

Officer Matthew Evans of the Metropolitan Nashville Police Department testified that he responded to the TA on April 5, 2010. When he arrived, the victim was bleeding and disoriented and his "ear was actually hanging off." The victim told him that four white males pulled him out of his tent, beat him with a stick when he refused to leave, forced him to walk toward North First Street, and cut his ear. The second responding officer, Sergeant Daniel Henkel, testified that both the campsite and railroad tracks had sufficient lighting for one person to identify the face of another.

Andrian Wayne Thomas, an acquaintance of the victim, testified that he saw the victim walking toward the TA the morning of the robbery. The victim's shirt "was all bloody [and] his ear was half off," so Thomas helped the victim walk to the TA. Thomas said that he returned to the TA the next

3

day and saw the [Petitioner] who bragged about getting into an altercation with a man the previous night, during which the man "got hurt real bad [and] his ear got cut."

Thomas Lee, who admitted that he participated in the robbery, testified against the [Petitioner] and Thompson in exchange for immunity. Lee said that he was with the [Petitioner], Thompson, and others when Thompson saw a bicycle next to a tent, approached the tent, and hit it to get the victim's attention. Thompson unzipped the tent and grabbed the victim by his legs. The victim broke free and ran out of the tent with a knife, and Thompson picked up a tree limb and hit the victim over the head "maybe" three times. The [Petitioner], who had a knife, was "doing the same thing that [Thompson] was doing." Lee walked behind the [Petitioner] and Thompson as they forced the victim toward the railroad tracks, and "Alex" walked up, pulled a knife, and "started doing the same thing [Thompson] was doing." The next day, Thompson had a second phone that he did not have the previous day.

Stephen Raines testified that he was currently incarcerated and previously had been housed near Thompson. Raines said that Thompson told him that he had "knocked somebody's ear off and they had to put a bunch of staples in it." Raines also testified that "[i]t was a homeless guy that [Thompson] hit with a stick . . . and [Thompson] said his charge partner actually wasn't there, the guy that was there didn't even get charged with it." Asked if Thompson was referring to the [Petitioner] as his "charge partner," Raines said, "Yeah, whoever got arrested."

**Defense Proof**

The [Petitioner] testified that he was at the TA on April 4, 2010, but that he left "to go get dope" between 9:00 and 9:30 p.m. with two women and a man named Alex. The [Petitioner] went back to the TA sometime later and stayed there by himself until the two women and Alex returned. The four of them walked to the War Memorial around 1:00 a.m., and Alex told the [Petitioner] there had been a fight at the railroad tracks.

The [Petitioner] said that he knew the victim prior to April 5, 2010, and that he had used drugs with him on "several occasions." He said that he discussed the robbery of the victim with Andrian Thomas but denied participating in it. He acknowledged that he had tattoos on both sides of his neck. The [Petitioner] explained that the knives found on his person the

4

day of his arrest were used for work. He said that he gave the arresting officer a false name because he "had warrants in Murfreesboro for a misdemeanor violation" but that he later gave his real name.

On cross-examination, the [Petitioner] admitted he had prior convictions for felony evading arrest, theft over $1000, forgery, and burglary of a motor vehicle.

The co-defendant, Jacob Thompson, testified that he, a man named Obbie, and Thomas Lee went to the victim's tent because they thought it was abandoned and wanted to take it to their campsite. To their surprise, the victim was there, and they banged on his tent to get him to leave. The victim refused, and Lee hit him. The victim went back into his tent and came out with a knife in his hand and shined a flashlight in their faces. The victim lunged at Lee and "instinctively [Thompson] picked up a stake that wasn't far from [him] and . . . hit [the victim] across his head which knocked him out" and "displaced" his ear.

Thompson testified that Lee went through the victim's pockets, taking his cell phone and some money. The victim woke up, and Lee escorted him by the back of his shirt to the railroad tracks, as Thompson and Obbie followed. Obbie grabbed a stick, knocked the victim across the knee caps, and hit the victim repeatedly in the head. While Obbie was beating the victim, Thompson saw their friends coming toward them along the tracks. While Thompson, Lee, and Obbie yelled across the tracks to explain to their friends what had happened, the victim ran away unnoticed. Thompson denied that the [Petitioner] was present during the robbery.

*Id*. at *1-3

### B. Post-Conviction Petition

The Petitioner filed a petition seeking post-conviction relief asserting that: (1) his trial counsel ("Counsel") was ineffective; (2) the State withheld exculpatory evidence; (3) he had new evidence that he was actually innocent of the charges; and (4) the trial court failed in its role as the thirteenth juror. At a hearing on the petition, the parties presented the following evidence: the Petitioner testified that he was thirty-five years old and serving seventeen years in prison for especially aggravated robbery. He testified that Counsel was appointed as his lawyer during his arraignment and represented him during his trial and on appeal. The Petitioner testified that he spoke with Counsel briefly after his arraignment, for maybe ten or fifteen minutes, and at that time he gave Counsel his

5

version of the events surrounding his charges. He said that he told Counsel that he was not present during the robbery. Counsel told him that he would attempt to find the people that the Petitioner was with and interview them, as well as seek surveillance video from the gas station where the Petitioner alleged he was located at the time of the incident, to confirm that he was not present during the robbery. Counsel, however, never followed-up with the Petitioner regarding his investigation. Counsel told him the weekend before trial that it was too late to obtain any videos.

The Petitioner recalled that he was incarcerated pending his trial. While there, he received a medical examination, but Counsel never asked about the results of that examination. He said that Counsel only visited him once, on the weekend before his trial, when the two met for one and a half to two hours. At the time, the two listened to Mr. Lee's interview, and Counsel provided him with a list of questions that he may ask in court. He did not feel that Counsel prepared him for trial. He opined that his lack of preparation hurt him at trial.

The Petitioner said that he attempted to call Counsel but that Counsel never answered or returned his calls. He also sent letters to Counsel, but Counsel never responded. He said that the two only spoke in court.

The Petitioner testified that Counsel spoke with him regarding a plea agreement. He asked Counsel for the discovery response, but Counsel did not provide him with discovery until after the trial.

The Petitioner said that Counsel appealed his convictions. When this Court affirmed the convictions, he told the Petitioner that he intended to seek permission to appeal to the Tennessee Supreme Court. The Petitioner said that Counsel never informed him that the Tennessee Supreme Court had denied his request for appeal. He did not learn of this fact until he wrote to the appellate court clerk on December 10, 2013. On that date, he informed the trial court that Counsel was not communicating with him and asked the status of his case. Two days later, he received a letter from the Tennessee Supreme Court informing him that his appeal had been denied.

During cross-examination, the Petitioner conceded that he had several other previous felony and misdemeanor convictions. The Petitioner agreed that he did not need any follow-up mental health services after his medical examination. The Petitioner agreed that another attorney represented him during the preliminary hearing. He did not present any alibi witnesses at his preliminary hearing.

The Petitioner agreed that he met with Counsel at each of his hearing dates, but he did not recall there being six court dates. He said that Counsel came prepared when he

met with him the weekend before the Petitioner's trial. Counsel told him that it was important for him to tell the truth if he testified at trial and then he gave him a list of potential questions and told him to answer them truthfully.

During redirect examination, the Petitioner testified that he remembered only two court dates. He said that, while he had previous convictions, this was the first case that was tried. The Petitioner said that, while Counsel gave him a list of questions, he never discussed cross-examination with him.

John Oliva testified as an expert in criminal defense law. He testified about client pretrial preparation and about developing a relationship with a client. He testified that the Petitioner's presentence report indicated that the Petitioner had been identified anecdotally as having Attention Deficit Disorder by his adoptive mother, which indicated the need for further mental health evaluation.

Mr. Oliva testified that the jail records indicated that Counsel visited the Petitioner in jail on two occasions, both shortly before trial and both lasting forty-five minutes. He opined it would be "very difficult to" adequately prepare a client in this period of time. He said that a client should be familiar with the charges, the State's discovery, the anticipated evidence, and the anticipated questions on direct and cross. Further, without adequate preparation for testifying at trial, a client might give a bad impression by seeming needlessly nervous or evasive.

Mr. Oliva said that some of the evidence at trial, such as the State asking the Petitioner about the process of smoking crack cocaine, was not relevant. He further found the State's questions about the Petitioner's tear drop tattoos as excludable evidence. Mr. Oliva said that Counsel could have had the knives found on the Petitioner forensically tested to determine if there was a specific blade used that would or would not match the victim's injuries.

Mr. Oliva testified that, while the presentence report briefly discussed the Petitioner being in foster care since he was eighteen months old and being adopted at fifteen, these issues were not explored for purposes of sentencing. He said that, when a client's social or mental health history is not "fleshed out," the trial court can miss applicable mitigating factors.

Examining the records Counsel submitted to the trial court, Mr. Oliva noted that Counsel did not submit any hours for preparing for the Petitioner's sentencing hearing. Mr. Oliva stated that the Petitioner's sentencing range was fifteen to seventeen years and that adequate preparation may have resulted in the Petitioner receiving a sentence of less than the seventeen-year sentence imposed. Mr. Oliva stated that it would have been

helpful for family or friends to be present at the hearings and that Counsel should have developed a rapport with these people and encouraged them to attend the trial.

Mr. Oliva testified that Counsel's appellate brief seemed sparse, the argument section being only a little more than a page in length. He noted that a trial attorney has an ongoing duty to communicate with a client. He then noted that there was a twenty-two month gap between letters sent by Counsel to the Petitioner. He said that this gap "may be appropriate" depending on what was happening in this time frame.

Mr. Oliva noted that a decision in *State v. Farmer* was filed during the pendency of Counsel's representation of the Petitioner. In that case, the Tennessee Supreme Court held that lay testimony about serious bodily injury is not always sufficient to prove that element. He found this significant to this case because there was no medical proof presented that the victim suffered serious bodily injury. In fact, there was only the victim's testimony that his ear had been partially severed and that his eardrum may have been ruptured. Mr. Oliva noted that Counsel did not challenge the State's proof of serious bodily injury at trial or on appeal. Further, he did not seek to have the victim's medical records made a part of the record for appellate consideration. Mr. Oliva noted that *Farmer* was filed eleven days after the Tennessee Court of Criminal Appeals' decision in the Petitioner's case. Mr. Oliva opined that there were "objective deficiencies" in Counsel's performance.

During cross-examination, Mr. Oliva testified that he was unaware of any family member present at the post-conviction proceeding who could have been called at sentencing. Mr. Oliva agreed that serious bodily injury included "obvious disfigurement." He further conceded that there were photographs of the victim's injuries admitted into evidence and also that the victim showed the jury his healed injury. The jury then made the determination regarding whether the victim suffered obvious disfigurement.

Mr. Oliva agreed that he misspoke about the Petitioner's applicable sentencing range. He agreed that his actual sentencing range was fifteen to twenty-five years and that the Petitioner received a seventeen-year sentence. Mr. Oliva agreed that the State offered a twenty year sentence in exchange for the Petitioner's guilty plea and that, by taking his case to trial, the Petitioner received a lesser sentence.

Mr. Oliva agreed that the State asked the questions regarding the steps to smoking crack cocaine in an effort to prove that the victim was in the presence of his attackers for an extended period of time, to bolster his identification of them. He further conceded that the Petitioner was the one who originally mentioned smoking crack cocaine, not the State.

Mr. Oliva opined that, had Counsel maintained regular communication with the Petitioner, they would have developed a better relationship. The Petitioner would have, therefore, been better prepared to testify at trial in a more persuasive manner. He said that, while the case was pending on appeal, better communication may have helped the Petitioner to communicate any specific information that he may have wanted to be included in an appeal.

During redirect examination, Mr. Oliva testified that it would have been easier to find potential alibi witnesses closer in time to the incident. He noted that the witnesses were homeless and attempting to identify them would have been difficult.

Counsel testified that he had been licensed to practice law in 1975 and that he had practiced criminal law for about twenty-two years. He said that he was regularly appointed to represent clients facing Class A felony charges.

Counsel testified that he was appointed to represent the Petitioner at his arraignment, at which time he learned that there had been a preliminary hearing and obtained a recording of the hearing. He listened to the recording of the preliminary hearing several times before he responded to discovery.

Counsel testified that he attempted to obtain a video recording from the truck stop mentioned by the Petitioner to support the Petitioner's alibi. When he went there, an employee informed him that the truck stop used a videotape recording system that would have recorded over any date more than thirty days old.

Counsel explained that at each of the six court appearances he and the Petitioner spoke about the Petitioner's case. He said that the Petitioner maintained throughout these discussions that he was not present during the crime. The Petitioner provided him with the names of two potential alibi witnesses, both of whom the Petitioner also named in his post-conviction petition. Counsel said that the attorney who represented the Petitioner at the preliminary hearing informed him that both of those witnesses were supposed to appear at the preliminary hearing and that neither of them showed up. Counsel also recalled that there was "something else about the" witness that "put him off," but without his file he could not readily recall it. He further stated that the Petitioner only referred to the other witness as "Alex" and did not offer his last name, making it impossible for Counsel to locate him as a witness.

Counsel explained that his office only accepted collect calls from inmates if Counsel was present in his office. He said that, when an inmate called collect, if his office accepted the call then his office was automatically charged $2.50. He said that he

instructed his secretary to only accept the call if he was in the office so as not to incur unnecessary expenses.

Counsel said that he offered the Petitioner the State's discovery response, but the Petitioner said that he did not want a copy in jail with him. Counsel said that this situation had presented itself before, in part because clients were fearful that someone would read their file and then misinform the State that the client confessed in jail to them.

Counsel said that the bill for his services was not prepared by him. He explained that, at the time, he used a third-party billing service, Billable Hours. He would submit his bill to Billable Hours, and the company would reimburse him immediately. It would then submit his bill to the Administrative Office of the Courts and wait for the State to reimburse them, which sometimes took three months. Counsel said he had never seen the bills they submitted on his behalf and that it appeared that the company "lump[ed]" together some of his hours. The Administrative Office of the Courts no longer allowed the use of a third-party billing company. He noted that, for instance, there was one entry that said "jail visit final trial prep" and indicated 4.5 hours. He said, however, there was time for a jail visit and time for final trial prep but that those were not the same as they appeared on the bill. He further noted that he did not always bill for everything he did to advance a case. Counsel explained that, if he was waiting in court on another case, he might review another client's presentence report. He often forgot to bill for this time. The bill submitted at the post-conviction hearing did not reflect all of his time. He then noted several specific events that he knew occurred on the Petitioner's behalf, like going to the truck stop, for which there was no entry in the bill.

Counsel said that he gave the Petitioner a list of questions he intended to ask him at trial. Counsel said that, based on his experience, he did not go over questions with his clients because he did not want to influence their testimony. Counsel said that he wanted clients to simply tell the truth. Counsel said that the questions regarding crack cocaine usage were designed to establish that the victim knew the Petitioner because the two had smoked crack cocaine together. He said that the Petitioner was "fine" with having this evidence before the jury for that purpose.

Counsel said that he intentionally kept his brief on appeal short, in part based upon advice from an appellate judge. The judge had informed him that the wordy briefs were not read by the judges but rather by the clerks.

Counsel testified that the State's offer in exchange for a plea agreement was twenty years. Counsel said that he considered it a victory when the Petitioner received a seventeen-year sentence, which was less time than the State's offer.

Counsel recounted that he did not think that the *Farmer* decision was applicable to the Petitioner's case. He said that the victim had a "very disfigured" ear and head from the twenty-five staples that he received as a result of his injuries. He said that, in his opinion, it obviously qualified as serious bodily injury. He said that he knew that he could, and had in other cases, submitted supplemental authority to the appellate court. He did not, however, think that this was necessary with *Farmer*.

Counsel recalled that he asked the Petitioner whether there was anyone that the Petitioner wished for Counsel to call at the sentencing hearing. The Petitioner did not give him the names of anyone that he thought would be helpful.

Counsel testified that at no time did the Petitioner appear any more depressed than anyone else he had represented. He said that, if he ever had a reason to believe that he had a client with mental health issues, he pursued it. Counsel then offered examples of when he successfully sought mental health evaluations. He said that, in talking to the Petitioner, there was no indication of anything other than normal depression resulting from being incarcerated, which was common among his clients.

During cross-examination, Counsel testified that on the day the trial court appointed him to represent the Petitioner, the two met for approximately fifteen minutes. He agreed that the Petitioner told him where he was located and who he was with at the time of the offense. Counsel did not speak to any of the witnesses, although he attempted to contact some of the witnesses but they refused to speak with him. He said that he did not petition the trial court to hire an investigator.

Counsel said that he went to see the Petitioner in jail on two occasions and that the two met in court on six different dates. During each of these meetings, the Petitioner maintained that he was not present during the assault and did not commit the assault.

Counsel recalled listening to the victim's interviews with the State's investigator and the district attorney. He said that he listened to the interviews alone and then again with the Petitioner. He said that he prepared the Petitioner to testify about his drug use at trial. They wanted to bring out that the victim knew the Petitioner because the Petitioner used to be his drug dealer and had bought crack cocaine from him previously.

Counsel testified that the Petitioner's co-defendant, Mr. Thompson, testified at trial that the Petitioner was not present during the incident but that Mr. Thompson was involved in the assault. Counsel agreed that he objected to the State's questions about the Petitioner carrying knives on his person. He also agreed that he objected on grounds of relevance and not on 404(b) grounds. He said he did not file a motion in limine to exclude this evidence. He agreed he did not object to some of the State's questions

11

regarding jailhouse fights, the steps of cocaine use, or the meaning of the Petitioner's tattoos.

On redirect examination, Counsel testified that this case hinged on the victim's identification of his assailant. Therefore, their trial strategy did not include attempting to show that the victim was not injured but, rather, that it was not the Petitioner who injured him and that it was a case of mistaken identity. To bolster this defense, the trial strategy included casting doubt on the victim's identification by showing that the victim might have been under the influence of crack cocaine at the time of the assault.

Dr. Edmund Carey, a physician at the Veterans Administration clinic, testified that he had reviewed the victim's medical records. He said that the victim suffered two lacerations on his scalp, one on the back of his head and one on the top of his scalp, some lacerations to both hands, and a nearly complete severing of his left ear. This injury included a perforation of the eardrum. The victim's records indicated that the scalp lacerations were both sutured and that a plastic surgeon reattached his ear. The victim stayed at the hospital for five or six hours before release. Dr. Carey noted that, while the victim rated his pain at a ten on a scale of one to ten, the prescribing physician gave him the minimum amount of pain medication, indicating that perhaps his pain was not as severe as he indicated. Dr. Carey opined that the victim's injuries were not permanently disfiguring. He said that the biggest injury was to the posterior of the ear in an area that could not be readily seen. Dr. Carey said that the victim indicated that his hearing had not returned to normal and that he was seeking treatment for the ruptured eardrum.

During cross-examination, Dr. Carey agreed that he had not seen or examined the victim so he was uncertain whether his scar was still visible. Dr. Carey agreed that he was uncertain whether, as legally defined, the victim was disfigured. Dr. Carey said that, while he was sure that the victim's injuries were "painful," he was not sure they were "extremely painful," despite the fact that the victim was beaten in his head until his eardrum perforated. Dr. Carey reiterated that he was unsure whether the victim suffered permanent hearing loss.

Based upon this evidence, the post-conviction court denied the Petitioner's petition for post-conviction relief. It is from this judgment that the Petitioner now appeals.

## II. Analysis
### A. Statute of Limitations

After this case was orally argued, the parties briefed whether the Petitioner's statute of limitations should be tolled based upon his alleged lack of knowledge of the

Tennessee Supreme Court's denial of his request for permission to appeal his case. The Petitioner contends that the statute of limitations should be tolled. The State counters that, although the Petitioner claims that Counsel failed to communicate with him, the extent of his efforts to find information from Counsel is unknown. The State further posits that, even assuming that the Petitioner diligently sought information about the progress of his case, any attorney negligence in this case presented nothing close to the "extraordinary combination of circumstances" that prevented the Petitioner from filing his post-conviction petition, as required by law. The State asks this Court to find that due process does not require the tolling of the statute of limitations.

The issue of the timeliness of the appeal arose because the Tennessee Supreme Court denied the Petitioner's application for permission to appeal on November 26, 2012. The Petitioner filed a pro se petition for post-conviction relief on January 14, 2014, six weeks beyond the one-year statute of limitations. The post-conviction court proceeded with the case as if it was timely filed, deciding the issues presented therein on their merits, and neither the post-conviction court nor the parties addressed the statute of limitations issue. At the post-conviction hearing, the Petitioner presented evidence that Counsel failed to inform him that the Tennessee Supreme Court had denied his application for permission to appeal. The Petitioner offered a letter that he wrote to the Appellate Court Clerk's Office on December 10, 2013, in which he asked the status of his appeal. Upon learning that his application for permission to appeal had been denied, he filed his pro se petition for post-conviction relief within a month.

Tennessee's Post-Conviction Procedure Act provides that a claim for post-conviction relief must be filed "within one (1) year of the date of the final action of the highest state appellate court to which an appeal is taken or, if no appeal is taken, within one (1) year of the date on which the judgment became final, or consideration of such petition shall be barred." T.C.A. § 40-30-102(a) (2014). "[T]he right to file a petition for post-conviction relief . . . shall be extinguished upon the expiration of the limitations period." T.C.A. § 40-30-102(a). "If it plainly appears from the face of the petition, any annexed exhibits or the prior proceedings in the case that the petition was not filed . . . within the time set forth in the statute of limitations, . . . the judge shall enter an order dismissing the petition." T.C.A. § 40-30-106(b). The Post-Conviction Procedure Act is explicit that the one-year statute of limitations "shall not be tolled for any reasons, including any tolling or saving provision otherwise available at law or equity." T.C.A. § 40-30-102(a).

The Act provides for only three narrow factual circumstances in which the statute of limitations may be tolled:

13

(1) The claim in the petition is based upon a final ruling of an appellate court establishing a constitutional right that was not recognized as existing at the time of trial, if retrospective application of that right is required. The petition must be filed within one (1) year of the ruling of the highest state appellate court or the United States [S]upreme [C]ourt establishing a constitutional right that was not recognized as existing at the time of trial;

(2) The claim in the petition is based upon new scientific evidence establishing that the petitioner is actually innocent of the offense or offenses for which the petitioner was convicted; or

(3) The claim asserted in the petition seeks relief from a sentence that was enhanced because of a previous conviction and the conviction in the case in which the claim is asserted was not a guilty plea with an agreed sentence, and the previous conviction has subsequently been held to be invalid[.]

T.C.A. § 40-30-102(b). Tennessee courts have also recognized that, in certain circumstances, strict application of the statute of limitations would deny a petitioner the reasonable opportunity to bring a post-conviction claim and that, in these instances, due process requires the tolling of the statute of limitations.

In *Whitehead v. State*, our supreme court discussed due process in a post-conviction context. The court identified three scenarios in which due process requires tolling the post-conviction statute of limitations. 402 S.W.3d 615, 623-24 (Tenn. 2013); *see also Williams v. State*, 44 S.W.3d 464 (Tenn. 2001); *State v. Nix*, 40 S.W.3d 459 (Tenn. 2001); *Seals v. State*, 23 S.W.3d 272 (Tenn. 2000); *Sands v. State*, 903 S.W.2d 297 (Tenn. 1995); *Burford v. State*, 845 S.W.2d 204 (Tenn. 1992). The first of the three circumstances involves claims for relief that arise after the statute of limitations has expired. *Whitehead*, 402 S.W.3d at 623. The second due process basis for tolling the statute of limitations involves prisoners whose mental incompetence prevents them from complying with the statute's deadline. *Id.* at 624. Neither of these two instances applies to the case presently before us.

The third exception, however, is when attorney misconduct necessitates the tolling of the statute of limitations. *Id.* Elaborating on this third exception, our supreme court concluded that a petition for post-conviction relief is entitled to due process tolling of the statute of limitations based upon the conduct of the petitioner's attorney when (1) the petitioner had been diligently pursuing his or her rights and (2) extraordinary circumstances prevented the timely filing of the petition. *Whitehead*, 402 S.W.3d at 631 (citing *Holland v. Florida*, 560 U.S. 631, 649 (2010)). The court clarified that "pursuing his or her right diligently" did "not require a prisoner to undertake repeated exercises in

futility or to exhaust every imaginable option, but rather to make reasonable efforts" to pursue the claim. *Id.* (quoting *Downs v. McNeil*, 520 F.3d 1311, 1323 (11th Cir. 2008)) (internal quotation marks omitted). The second prong is met when a petitioner's attorney of record abandons the petitioner or acts in a way directly adverse to the petitioner's interests, such as by actively lying or otherwise misleading the petitioner to believe things about his or her case that are not true. *Id.* (citations omitted).

Counsel in *Whitehead* erroneously advised the petitioner of the deadline for filing a pro se post-conviction petition and failed to deliver promptly to the petitioner the litigation files necessary to prepare the petition. 402 S.W.3d at 632-33. The court held that the combination of these circumstances prevented the petitioner from filing a timely post-conviction petition and required due process tolling of the statute of limitations. *Id.* However, the court emphasized that due process tolling "must be reserved for those rare instances where−due to circumstances external to the party's own conduct−it would be unconscionable to enforce the limitation period against the party and gross injustice would result." *Id.* at 631-32 (internal quotation omitted).

The testimony at the post-conviction hearing included the Petitioner's assertions that he called Counsel multiple times to determine the status of his case. Counsel testified that it was the policy of his office to refuse collect calls from inmates unless Counsel was present. He agreed the Petitioner's calls were likely refused in accordance with this policy. Counsel offered no evidence that he informed the Petitioner of the Tennessee Supreme Court's denial of his Rule 11, which initiated his statute of limitations for his post-conviction petition. The Petitioner wrote a letter to the Appellate Court asking the status of his case, he learned his Rule 11 had been denied, and he filed a post-conviction petition shortly thereafter. We conclude that the Petitioner diligently pursued his case. We further conclude that Counsel abandoned the Petitioner's case by not informing him of the Rule 11 denial. Accordingly, we conclude that due process considerations necessitate our review of the issues the Petitioner's raises on their merits.

## B. Post-Conviction Petition

On appeal, the Petitioner maintains that Counsel's representation was ineffective. He claims that Counsel was ineffective at trial for: (1) failing to establish a working relationship with him; (2) failing to investigate the case; (3) failing to fully understand the evidentiary rules and applicable law; and (4) failing to raise legal issues that would have affected the verdict. He asserts Counsel was ineffective on appeal for failing to raise and preserve and argue potential favorable legal arguments. The Petitioner further asserts that the State violated *Brady v. Maryland*, by failing to provide Counsel with the victim's medical records. The Petitioner avers that he has provided new and reliable evidence that he is actually innocent and that the trial court should have utilized the thirteenth juror

15

rule. The State counters that the Petitioner is not entitled to post-conviction relief on any of these issues.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2014). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2014). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id*. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at

16

936. To prevail on a claim of ineffective assistance of counsel, "a petitioner must show that counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "'The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation.'" *House*, 44 S.W.3d at 515 (quoting *Goad*, 938 S.W.2d at 369).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### 1. Counsel's Effectiveness at Trial

The Petitioner contends that Counsel was ineffective during the trial phase of his representation for: (1) failing to establish a working relationship with him; (2) failing to investigate the case; (3) failing to fully understand the evidentiary rules and applicable

law; and (4) failing to raise legal issues that would have affected the verdict. About these issues, the post-conviction court made the following findings:

The Petitioner alleges that trial counsel was ineffective in failing to establish a proper working relationship prior to trial. He says that trial counsel only met with him one time and failed to prepare for trial. The Court credits [Counsel's] testimony and finds that he met with the Petitioner several times prior to trial, including on discussion dates in court. The Court further finds that [Counsel] gave the Petitioner a list of questions to consider prior to testifying. While he did not coach the Petitioner or give him answers to the questions, the Court finds that he did prepare the Petitioner to testify by giving him questions and instructing him to tell the truth. There is no evidence before the Court that leads the Court to conclude that [Counsel] was unprepared for trial.

The Petitioner next alleges that trial counsel failed to familiarize himself with the law applicable to this case. There is no evidence to support this blanket assertion. The Court does not find that this claim is well taken.

Next, the Petitioner contends that trial counsel was ineffective in failing to meet with or inquire about defense witnesses. The Court credits [Counsel's] testimony and finds that he did investigate some potential witnesses, but he had nothing to work with other than their first names. And the Petitioner made no showing that [Counsel's] decision not to call other witnesses was not a reasonable strategic decision. The Petitioner has not demonstrated that [Counsel] was ineffective in this regard. Moreover, the Petitioner has failed to demonstrate prejudice as a result of the alleged ineffectiveness.

The Petitioner next claims that [Counsel's] decisions did not constitute a coherent trial strategy. The Petitioner points to [Counsel's] cross-examination of the victim at trial as evidence of this claim. The Court is not in a position to second-guess cross-examination questions or themes. The Court finds this to be a reasonable strategic decision, even if the Petitioner, in hindsight, would have asked other questions. The Court further finds that prejudice has not been demonstrated.

The Petitioner further asserts that trial counsel demonstrated a lack of knowledge and limited understanding of the State's case, which included the victim's identification of the Petitioner and a connection between the

18

cut on the victim's ear and the knife found on the Petitioner. The Petitioner points to the fact that [Counsel] did not call more witnesses to discuss the visibility and conditions on the night of the attack, or the reliability of eyewitness identifications. Again, while the Petitioner might, in hindsight, have called other witnesses, the Court cannot say that [Counsel's] trial strategy or choices of whether to call additional witnesses was objectively unreasonable and ineffective. And, again, the Petitioner has failed to demonstrate prejudice in connection with this claim.

Finally, the Petitioner contends that trial counsel was ineffective in failing to argue that the Petitioner should not be charged with especially aggravated robbery. Despite Dr. Car[]ey's opinions to the contrary, the Court does not find that the victim's injuries could not have constituted "serious bodily injury" for purposes of the especially aggravated robbery statute. [Counsel] testified that it seemed obvious to him that the injuries would satisfy that statute, and the Court does not find that this opinion and subsequent strategic decisions render his representation ineffective. Moreover, as with the aforementioned issues, the Petitioner has failed to demonstrate prejudice.

For the reasons discussed above, the Court finds that the Petitioner is not entitled to relief on his ineffective assistance of trial counsel claim.

After review, we conclude that the evidence does not preponderate against the post-conviction court's findings. The post-conviction court accredited Counsel's testimony that he met with the Petitioner on several occasions, including at the time of the Petitioner's court appearances. He further met with the Petitioner twice in jail the weekend before trial. There is no evidence that Counsel met with the Petitioner so infrequently so as to inhibit his working relationship with the Petitioner and, further, there is no evidence showing how more meetings would have resulted in a better defense.

Similarly, the Petitioner has not proven how Counsel's investigation was deficient. Again, the post-conviction court accredited Counsel's testimony. Counsel said he went to the truck stop where the Petitioner said that he was at the time of the crime, but the surveillance video was only kept for thirty days and was unavailable. Counsel was not appointed to represent the Petitioner within thirty days of the offense. Counsel testified that he attempted to investigate the alibi witnesses. He learned from the Petitioner's counsel at the preliminary hearing that neither alibi witness appeared at the hearing, although both indicated that they would attend. One of the witnesses Counsel could not locate and the other he chose not to call for reasons that he could not recall. The Petitioner has not met his burden of showing that this was an unreasonable strategic

19

decision. Further, the Petitioner did not call either witness at the post-conviction hearing, which is a prerequisite to post-conviction relief. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990) (stating that "[w]hen a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing").

In the Petitioner's reply brief, he asserts that the *Black* rule is inapplicable in this case because post-conviction counsel was hired so long after the offenses herein and the witnesses were transient and unable to be located. We disagree. Counsel said that the witnesses did not appear at the preliminary hearing, despite being subpoenaed. These witnesses, according to the Petitioner, were transient, homeless, and drug users. It is conceivable that they were unavailable even shortly after the offenses. Counsel said that he could not locate one of the witnesses and that he chose to call another for strategic reasons. We conclude that the Petitioner is not entitled to relief on this basis.

The Petitioner contends that Counsel was ineffective for failing to fully understand the evidentiary rules and applicable law. The Petitioner notes that knives found on the Petitioner were admitted as evidence over Counsel's relevance objection. The Petitioner asserts that Counsel should have also objected pursuant to 404(b), evidence of other crimes and should have filed a motion in limine. He further asserts that Counsel should have objected when the State cross-examined him regarding his use of crack cocaine, his fights while in custody, and the meaning of his tattoos. We conclude, as did the post-conviction court, that Counsel's representation was not inadequate. Counsel objected to the admission of the knives. The trial court, in a bench conference, held that the victim had been cut and that the knives were found on the Petitioner, who was a suspect. The trial court noted that it was up to the State to prove that the knives were used in the offense and that Counsel could argue that they were not. The State introduced proof that DNA testing showed no evidence linking the knives to the victim's attack, and Counsel argued that this fact supported his theory that the victim had misidentified the Petitioner. Counsel's failure to file a motion in limine or to also object on the grounds of 404(b) did not render his assistance ineffective. About Counsel's lack of objection to the State's cross-examination of the Petitioner, we agree with the post-conviction court that this was a matter of strategy. Counsel wanted to show that the victim and the Petitioner were familiar with each other because they had smoked crack cocaine together. He opined that this would support a theory that the victim simply identified the Petitioner because he knew him, even though he did not actually know any of his assailants. About the other two matters, we conclude that the Petitioner has not proven that, but for any error on Counsel's part, the outcome of the trial would have been different.

Finally, the Petitioner contends that Counsel was ineffective for failing to raise legal issues that would have affected the verdict. He asserts that Counsel should have

argued that the victim's injury did not fall within the statutory meaning of "serious bodily injury." *See* T.C.A. § 39-13-403(a)(2) (2016). Serious bodily injury includes "protracted or obvious disfigurement." Counsel testified that it seemed obvious to him that the victim's injuries that included a disfigured ear, which the victim displayed for the jury, and a perforated eardrum would satisfy that statute. We conclude, as did the post-conviction court, that Counsel's assessment of the victim's injuries did not render his representation ineffective.

## 2. Counsel's Effectiveness on Appeal

The Petitioner next asserts that Counsel was ineffective on appeal for failing to raise, preserve, and argue potentially favorable legal arguments. The Petitioner contends that Counsel should have raised more issues than simply sufficiency of the evidence. He asserts that Counsel should have raised the admission of the knives, the evidence that he fought while incarcerated, and the classification of the victim's injuries as qualifying as "seriously bodily injury." About this issue, the post-conviction court found:

> The Petitioner contends that [Counsel] was ineffective on appeal in two ways. First, he claims that [Counsel] was ineffective in only raising a single issue on appeal. The Petitioner states that there were many other "legitimate claims," although the Petitioner does not explain what those issues are. "If a claim of ineffective assistance of counsel is based on the failure to raise a particular issue, as it is in this case, then the reviewing court must determine the merits of the issue." *Carpenter v. State*, 126 S.W.3d 879, 887 (Tenn. 2004) (citing *Kimmelman v. Morrison*, 477 U.S. 365, 375, 106 S. Ct. 2574, 91 L.Ed.2d 305 (1986)). In making this determination, courts look to the following non-exhaustive list of factors:
>
> > 1) Were the omitted issues "significant and obvious"?
> > 2) Was there arguably contrary authority on the omitted issues?
> > 3) Were the omitted issues clearly stronger than those presented?
> > 4) Were the omitted issues objected to at trial?
> > 5) Were the trial court's rulings subject to deference on appeal?
> > 6) Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
> > 7) What was appellate counsel's level of experience and expertise?

21

8) Did the petitioner and appellate counsel meet and go over possible issues?
9) Is there evidence that counsel reviewed all the facts?
10) Were the omitted issues dealt with in other assignments of error?
11) Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Carpenter*, 126 S.W.3d at 888 (citing Mapes v. Coyle, 171 F.3d 408, 427-28 (6th Cir.1999)).

Unfortunately, the exhibits introduced at the post-conviction hearing contain nothing to assist the Court in this analysis. The Petitioner did enter the Court of Criminal Appeals' opinion as an exhibit; however, this only shows what [Counsel] raised on appeal and provides no insight into any issues not raised. All the Court has before it is the Petitioner's argument and his statement that there were other legitimate issues that could have been raised.

The Petitioner bears the burden of proving allegations of fact by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The Court finds that he has failed to meet this burden as to his claims of ineffective assistance of appellate counsel. Neither the exhibits offered at the hearing, nor the testimony of [Counsel] or any other witness, are sufficient to prove that [Counsel] was ineffective on appeal under the *Strickland* standard. Moreover, the Court finds that the Petitioner has failed to establish that he was prejudiced by the alleged deficiency. Because the [Petitioner] has failed to satisfy the burden of proof, the Court finds that he is not entitled to relief on this issue.

The test for ineffective assistance of counsel is the same for both trial and appellate counsel under the *Strickland* standard set forth above. *Id*. That is, a petitioner alleging ineffective assistance of appellate counsel must prove both that appellate counsel was deficient in failing to adequately pursue or preserve a particular issue on appeal and that, absent counsel's deficient performance, there was a reasonable probability that the issue "would have affected the result of the appeal." *Id*. at 597; *see also Carpenter v. State*, 126 S.W.3d 879, 886-88 (Tenn. 2004).

We find that Counsel's performance on appeal was not deficient and that the Petitioner has not shown that he was prejudiced by any alleged deficiency in Counsel's

22

performance in this regard.  Regarding claims of ineffective assistance by appellate counsel, our supreme court has provided:

> Appellate counsel are not constitutionally required to raise every conceivable issue on appeal.  Indeed, experienced advocates have long emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible, or at most a few key issues.  The determination of which issues to raise on appeal is generally within appellate counsel's sound discretion.  Therefore, appellate counsel's professional judgment with regard to which issues will best serve the appellant on appeal should be given considerable deference.

*Carpenter*, 126 S.W.3d at 887 (citing *King v. State*, 989 S.W.2d 319, 334 (Tenn. 1999); *Campbell*, 904 S.W.2d at 596-97).

When a petitioner alleges that appellate counsel was deficient for failing to raise an issue on direct appeal, the reviewing court must determine the merits of that issue.  *Id.*  "Obviously, if an issue has no merit or is weak, then appellate counsel's performance will not be deficient if counsel fails to raise it."  *Id.*  Further, when an omitted issue is without merit, the petitioner suffers no prejudice from appellate counsel's failure to raise the issue on appeal and cannot prevail on an ineffective assistance of counsel claim.  *Id.* at 887-88.  Counsel in this case testified that he filed a brief that raised only one issue in hopes that the appellate judges would read his brief and focus on that issue, which he believed had the most merit.  The Petitioner has not demonstrated that there was merit to any of the issues he posits that Counsel should have raised.  We will not "second-guess" Counsel's decision not to raises these issues.

### 3. *Brady v. Maryland*

The Petitioner further asserts that the State violated *Brady v. Maryland,* 373 U.S. 83 (1963), by failing to provide Counsel with the victim's medical records.  He asserts that these records were favorable and material in that they contain a statement made by the victim that "they used a knife" without any identifying details of who "they" were.  The State counters, first, that this information was not exculpatory and, second, that the information was in the possession of the hospital and equally available to the Petitioner as it was to the State.  The post-conviction court found:

> The Petitioner alleges that the State committed prosecutorial misconduct by withholding the victim's medical records from the night he was treated for wounds he sustained during the incident in this case.  According to the Petitioner, withholding these records amounted to a *Brady*

23

violation. *Brady v. Maryland*, 373 U.S. 83 (1963). To establish a *Brady* violation, the Petitioner must establish four elements: (1) the Petitioner requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information whether requested or not); (2) that the State suppressed the information; (3) that the information was favorable to the Petitioner; and (4) that the information was material. *Johnson v. State*, 38 SAN.3d 52, 56 (Tenn. 2001) (citations omitted). Assuming, *arguendo*, that the Petitioner has established the first two elements, the Court has reviewed the medical records and finds that they would not be favorable to the Petitioner. Contrary to the Petitioner's argument that the records establish that the victim was assaulted with a tree branch, and not a knife, the records reflect that the victim reported being "assaulted by five males[,] and they used a knife." Victim's Progress Notes 16. The records also reflect that the Petitioner "appeared to be in pain." *Id.* The Court finds nothing exculpatory about the records, and therefore, the Petitioner has not established a *Brady* violation.

We conclude that the evidence does not preponderate against the post-conviction court's ruling. After review, we agree that the records about which the Petitioner complains reflect that the victim reported that he was assaulted with a knife. The records do not contain information that is exculpatory, which would be necessary in order for a grant of post-conviction relief.

We further find unpersuasive the argument that the Petitioner raises for the first time on this appeal, i.e. that the statement that "they," referring to the five males, assaulted him is exculpatory. While the victim did not specifically identify the Petitioner as one of his assailants, this information is only slightly exculpatory. The victim did not identify any of the five men until the police questioned him later. In any event, to be entitled to post-conviction relief, the Petitioner would need to show that the evidence was "material" meaning that there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *State v. Egdin*, 902 S.W.2d 387, 390 (Tenn. 1995). This evidence does not meet that requirement. The Petitioner is not entitled to relief.

### 4. Actual Innocence

The Petitioner avers that he has provided new and reliable evidence that he is actually innocent. He asserts that he presented new exculpatory scientific evidence in the form of the testimony of Dr. Carey. He asserts that Dr. Carey testified that the low dosage of morphine administered to the victim, in conjunction with his medical records, supported that his injury was mild and did not qualify as "serious bodily injury" so as to

support an essential element of his conviction. The State responds that the Petitioner waived this claim by failing to raise it. The State notes that his "actual innocence" argument below addressed only the testimony of identification witnesses and the evidentiary value of the knife found in his possession. It further notes that Dr. Carey's testimony does not qualify as "new scientific evidence."

About the Petitioner's actual innocence claim raised at the trial court level, the post-conviction court found:

> The Petitioner asserts that he has demonstrated that he is actually innocent of this offense and that sustaining his conviction would amount to a fundamental miscarriage of justice. The Court finds the argument set forth in the petition to be unpersuasive, and the evidence to support the argument lacking. Therefore, the Court finds that the Petitioner is not entitled to relief on this issue.

The State is correct that, generally, issues not addressed in the post-conviction court will not be addressed on appeal. *Walsh v. State*, 166 S.W.3d 641, 645 (Tenn. 2005). Even if not waived, the Petitioner is not entitled to post-conviction relief on this basis. "Serious bodily injury" as defined by the relevant statute, includes "protracted or obvious disfigurement." *See* T.C.A. § 39-11-106(a)(34). The jury in this case was instructed as such, they saw the victim whom by all accounts was missing a portion of his ear, and the jury determined that the victim's injuries constituted the statutorily defined "seriously bodily injury." Dr. Carey's testimony that the victim may not have been in as much pain as he said does not constitute new scientific testimony proving the Petitioner's actual innocence. He is not entitled to relief.

### 5. Thirteenth Juror Rule

The Petitioner asserts that the trial court should have utilized the thirteenth juror rule. He asserts that the trial court should have agreed that the weight of the evidence went against the jury's verdict and granted him a new trial. The State counters that the post-conviction court ruled that it was satisfied with the evidence. Further, when the court approves a verdict, appellate review is limited to sufficiency of the evidence, which is not a cognizable post-conviction claim. *See Cole v. State*, 798 S.W.2d 261, 264 (Tenn. Crim. App. 1990).

> The Petitioner claims that the record demonstrates that this Court was dissatisfied with the weight of the evidence underlying the jury's verdict. He points to the Court's statements during the hearing on his motion for new trial that Jacob Thompson's testimony "was unusual to say

the least" and that the Court would "look it over and . . . take it under advisement."

Rule 33(d) of the Tennessee Rules of Criminal Procedure, also known as the thirteenth juror rule, provides: "The trial court may grant a new trial following a verdict of guilt if it disagrees with the jury about the weight of the evidence." The Court respectfully rejects the Petitioner's argument. The Court was satisfied with the jury's verdict, accepted the verdict and denied the Petitioner's motion for new trial. The Court finds that the Petitioner is not entitled to relief on this issue.

When the trial court approves of the verdict pursuant to Rule 33(d), our review is limited to whether the evidence is sufficient to sustain the conviction. *State v. Burlison*, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). "The law is settled beyond question that . . . post-conviction proceedings may not be employed" to "question the sufficiency of the evidence." *Gant v. State*, 507 S.W.2d 133, 136 (Tenn. Crim. App. 1973). The Petitioner is not entitled to relief on this issue.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment.

_____
ROBERT W. WEDEMEYER, JUDGE

26